[No. 5229-0–III.   Division Three.   May 24, 1984.]

HAROLD ADAMS, ET AL, *Appellants,* v. RICHLAND CLINIC, INC., P.S., *Respondent.*

*Robert T. Beaty* and *R. M. Holt,* for appellants.

*Orville B. Olson* and *Olson, Olson, Hevel & Vander-schoor,* for respondent.

THOMPSON, J.—Harold and Diana Adams appeal a decision granting the motion of Richland Clinic, Inc., for directed verdict in Mrs. Adams' medical malpractice action.[1] Plaintiff's appeal addressed the dismissal of her negligent treatment and informed consent claims. We affirm the dismissal of the treatment claims, but reverse and remand for a new trial of the informed consent cause of action.

In 1977, Mrs. Adams read a magazine article promoting a surgical procedure for alleviating weight problems. She generally enjoyed good health, but had a chronic weight problem and had unsuccessfully tried several diet plans.

---

[1] For convenience, "plaintiff" or "Mrs. Adams" will be used instead of Harold and Diana Adams, and "Richland Clinic" will be substituted for "Richland Clinic, Inc."

Prompted by the magazine article, in July 1977, she contacted Dr. Heap at the Richland Clinic. Dr. Heap advised Mrs. Adams he did not do the procedure described in the magazine but performed a less risky and more successful surgery known as a gastric bypass which entailed stapling the stomach into two pouches to reduce food intake. He drew an explanatory diagram for her to assist in explaining the procedure.

Prior to meeting with Dr. Heap, Mrs. Adams had prepared a list of questions. The doctor answered some of these questions. For example, he explained obese people tend to have more problems with anesthetics. He explained generally the risks attendant to major surgery. His answers to other questions were less specific, commenting that some of her questions were very good questions. He did not explain specific risks attendant to the gastric bypass procedure. Mrs. Adams, who had never had psychiatric care, asked if she would need a psychiatric evaluation prior to the surgery. Dr. Heap responded he did not think it would be necessary. Finally, she was instructed she would have to return with her husband because Dr. Heap would not undertake such surgery without her husband's consent.

Later, Mrs. Adams, together with her husband, met with Dr. Heap to further discuss the procedure. Dr. Heap drew a second diagram and advised the bypass was a serious procedure with a 2½ percent mortality and 3 to 4 percent morbidity rate. He discussed major risks associated with any surgery under general anesthesia, but made no mention of the possibility of ulcers or hernias as surgical complications. He did not discuss the risk the staples could pull apart, nor the necessity for dieting after surgery. Dr. Heap told the couple he had performed the surgery before, and in response to Mrs. Adams' question of what could be done if something went wrong during surgery or further down the line, Dr. Heap instructed he would "unstaple" (reverse the procedure).

Without referral to other specialists, Dr. Heap determined Mrs. Adams was a candidate for gastric bypass sur-

gery and performed that procedure on September 9, 1977, in the Tri–Cities. A few days later, Mrs. Adams started vomiting bile. Dr. Heap observed by gastroscopy (tube placed down the throat into the stomach) a breakdown of the stomach staple line. Neither Mr. nor Mrs. Adams was advised of the gastroscopy results. On the day the breakdown was discovered, Dr. Heap advised Mrs. Adams a second surgery was necessary, but she told him she did not want a second surgery. Rather, she pleaded with him to unstaple her stomach and to return her to her presurgery condition. He responded that "too many complications had arisen" to reverse the procedure. Prior to the second surgery, Mr. Adams testified he also talked with Dr. Heap and asked his opinion about reversing the surgery. Dr. Heap said, "he didn't know" and would have to operate to determine what was wrong. Finally, Mr. Adams told the doctor to do what he thought best and a second surgery was performed September 15, 1977. After the second surgery, Dr. Heap informed Mr. Adams he had discovered the staple line had given way. He had restapled it, but had to cut out a portion of the stomach that had died. At this point, Dr. Heap said a reversal of the bypass was impossible.

Mrs. Adams did not respond to the second surgery, necessitating a third surgery on September 22, 1977, and a fourth and fifth before mid–October 1977. Mrs. Adams also developed pneumonia and experienced withdrawal symptoms from the morphine which had been administered for pain since the first surgery. On October 29, 1977, she was discharged from the hospital.

Dr. Heap followed Mrs. Adams postoperatively, prescribing Valium and Tylenol for her nerves and stomach discomfort. Intermittently she developed abscesses where tubes had been used to drain her stomach through an open wound. Late in 1978, she developed an incisional hernia. At about this time, Dr. Heap began treating the patient with a new ulcer medication for stomach discomfort. He did not instruct Mrs. Adams that the medication was used to treat ulcers. Mrs. Adams was surprised to learn from the doctor

at this same time that she would need to continue dieting if she was to lose weight.

By mid–1980, Mrs. Adams still had an open stomach wound from the surgery. At this time, Dr. Heap suggested a brace to alleviate hernia discomfort and he stated, though he did not want to operate again, hernia surgery could be necessary in the future. Mrs. Adams last saw Dr. Heap in September 1980.

In 1981, another doctor diagnosed her hernia and the ulcer and hernia were surgically repaired at the University of Washington Hospital. Mrs. Adams has since complained of abdominal pain, for which doctors have been unable to associate an organic basis. Presently, she is receiving psychiatric care.

At trial, Mrs. Adams contended her surgeries were negligently performed and that bypass surgery should not be performed in the Tri–Cities. Dismissal of this claim is not specifically challenged on appeal.[2]

Mrs. Adams' treatment case is based on the assertions that (1) Dr. Heap, prior to the first surgery, failed to properly ascertain whether she was a candidate for the assertedly experimental procedure by failing to refer her to other specialists, such as a psychiatrist; (2) Dr. Heap should have diagnosed and surgically treated Mrs. Adams' postsurgical ulcer years earlier, and that he should not have tried to treat her symptoms medically; (3) the incisional hernia which resulted from the five surgeries was not properly managed by Dr. Heap.[3]

Mrs. Adams first assigns error to dismissal of these treatment claims, contending the court misapplied the "locality rule" rather than the "statewide rule" in determining whether plaintiff had established a recognized standard of care in the community. The plaintiff correctly

---

[2]None of the experts found fault with the actual performance of the five surgeries.

[3]The failure to reconnect after the first surgery has been treated by the parties as an informed consent issue rather than a treatment question.

states Washington long ago abandoned the "locality rule" which mandated reference to the standard of care in the same community or in the same or similar locality where the defendant practiced. *Douglas v. Bussabarger,* 73 Wn.2d 476, 489–90, 438 P.2d 829 (1968); *Pederson v. Dumouchel,* 72 Wn.2d 73, 77, 431 P.2d 973, 31 A.L.R.3d 1100 (1967). Instead, in 1976, the geographic parameters to the applicable standard of care were codified in a statewide definition. Laws of 1975, 2d Ex. Sess., ch. 56, § 9, codified at RCW 7.70.040(1) (mandating a practitioner exercise that degree of skill expected in the profession "in the state of Washington").

While the trial court referenced "this community" in its oral ruling, a reading of the entire passage reflects a concern by the trial judge that the experts were testifying to mere personal opinion in a university setting as opposed to articulating the recognized standard of care for the profession in the state of Washington. Testimony reflecting only a personal opinion or testimony of experts that they would have followed a different course of treatment than that of the defendant is insufficient to establish a standard of care against which a jury must measure a defendant's performance, since the fact finder may not be given the choice of choosing between two standards. *Hayes v. Hulswit,* 73 Wn.2d 796, 800, 440 P.2d 849 (1968).

Accepting Dr. Heinbach's and Dr. Lennard's testimony as true, and giving that testimony all reasonable inferences, *Moyer v. Clark,* 75 Wn.2d 800, 803, 454 P.2d 374 (1969), we are unable to find plaintiff presented evidence of a statewide standard of care rather than a local standard or mere personal opinion in 1977. The experts acknowledged familiarity with Drs. Alden's and Mason's literature, and testified the University of Washington's procedures were consistent with this pioneer literature. However, they further stated their opinions were personal. The questions propounded were not in standard of care terminology; accepted practices in Washington were not identified either before or after the experts stated their opinions were per-

sonal. At no time did an expert express an opinion that a failure to conform to the Alden/Mason literature was conduct inconsistent with a recognized standard of care. In fact, Dr. Lennard testified that Dr. Heap's management with the treatment of the various complications violated no standard of care.

We therefore affirm dismissal of the treatment claims. Having determined no Washington standard of care was presented to the trial court, it is unnecessary to address plaintiff's further premise that the "reasonable prudence" standard and not the "average practitioner" rule should be applied on remand to evaluate these claims.

Mrs. Adams additionally assigns error to the dismissal of her informed consent claim, contending that expert testimony is unnecessary in a consent case except to establish what risks attend a surgical procedure.

██ Based upon the premise that a competent individual has a right to determine what should be done with her body, the doctrine of informed consent mandates that a physician inform the patient of the procedure's attendant risks before obtaining the patient's consent to treatment. *Smith v. Shannon,* 100 Wn.2d 26, 29, 666 P.2d 351 (1983). The court in *Smith* has taken the opportunity to delineate the extent to which expert testimony is necessary in an informed consent case.

The doctrine does not place upon the physician a duty to explain all possible risks, but only those of a serious nature. *Smith,* at 31. The guide for disclosure is the test of materiality, which is an objective one, but incorporates the underlying concept of "patient sovereignty". *Smith,* at 31; *Miller v. Kennedy,* 11 Wn. App. 272, 287, 522 P.2d 852 (1974), *aff'd,* 85 Wn.2d 151, 530 P.2d 334 (1975); *see also* RCW 7.70.050(1)(a) and (c); RCW 7.70.050(2).[4] That is, if the

---

[4]RCW 7.70.050 provides:

"(1) The following shall be necessary elements of proof that injury resulted from health care in a civil negligence case or arbitration involving the issue of the alleged breach of the duty to secure an informed consent by a patient or his representatives against a health care provider:

reasonable person in the patient's position would attach significance to a risk in deciding treatment, the risk is material. *Smith v. Shannon, supra.* The duty to disclose similarly attaches to recognized possible alternative forms of treatment and to the anticipated results of the treatment proposed and administered.[5] RCW 7.70.050(3)(b) and (c).

It was conceded in *Smith* that the rules governing the necessity for expert testimony have shifted in recent years. *Smith,* at 32. In reconciling past judicial pronouncements, the court explained that determination of materiality of a risk is a 2–step process. The first prong is to define the existence and nature of the risk and the likelihood of its

---

"(a) That the health care provider failed to inform the patient of a material fact or facts relating to the treatment;

"(b) That the patient consented to the treatment without being aware of or fully informed of such material fact or facts;

"(c) That a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts;

"(d) That the treatment in question proximately caused injury to the patient.

"(2) Under the provisions of this section a fact is defined as or considered to be a material fact, if a reasonably prudent person in the position of the patient or his representative would attach significance to it deciding whether or not to submit to the proposed treatment.

"(3) Material facts under the provisions of this section which must be established by expert testimony shall be either:

"(a) The nature and character of the treatment proposed and administered;

"(b) The anticipated results of the treatment proposed and administered;

"(c) The recognized possible alternative forms of treatment; or

"(d) The recognized serious possible risks, complications, and anticipated benefits involved in the treatment administered and in the recognized possible alternative forms of treatment, including nontreatment.

"(4) If a recognized health care emergency exists and the patient is not legally competent to give an informed consent and/or a person legally authorized to consent on behalf of the patient is not readily available, his consent to required treatment will be implied."

[5]A list of exceptions to the duty to disclose has been collected in *Holt v. Nelson,* 11 Wn. App. 230, 240, 523 P.2d 211 (1974), cited with approval in *Smith v. Shannon, supra* at 30 n.1; *see also* RCW 7.70.050(4). The exceptions have not been addressed by the parties. While some of these matters, for example, no duty to disclose in the face of an imminent life threatening setting, may have application to the case at hand, such exceptions generally must be analyzed in the context of the surrounding circumstances, and are matters to be proved by the defense.

occurrence. *Smith,* at 33. "Some" expert testimony is necessary to show this aspect of materiality because such facts are generally not describable without medical training. *Smith,* at 33–34. However, the second prong, that is, whether the probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment, is strictly an issue for the trier of fact. *Smith,* at 33.

Here, with the first surgery, Mrs. Adams concedes disclosure of the general surgical risks but contends that before the first surgery she should have been informed of the specific risks associated with the bypass and that the procedure was still experimental. The record reveals testimony of the specific risks of hernias and of ulcers. The record further reveals Dr. Heap allegedly did not advise her until after her surgeries that she would have to diet after the procedure to acquire weight loss or that the staple line might come apart and leakage may occur. Concerning the second surgery, Mrs. Adams asserts Dr. Heap should have disclosed prior to the second surgery the alternative of reversing the procedure.

■ To Richland Clinic's argument that the signed surgical consent form was prima facie evidence which Mrs. Adams had the burden of rebutting by a preponderance of the evidence, RCW 7.70.060, the trial court specifically found that such evidence in the face of the other testimony was insufficient to show that these particular risks and other factors were explained. Moreover, procedurally, since the case was in the posture of a directed verdict, for purposes of the motion, Mrs. Adams' collective testimony had to be accepted as true including all reasonable inferences. *Moyer v. Clark, supra* at 803. For the motion to be granted, and therefore upheld on appeal, there must be no evidence to provide a reasonable inference for sustaining a jury verdict for the plaintiffs. *Browning v. Ward,* 70 Wn.2d 45, 48, 422 P.2d 12 (1966); *Koppang v. Hudon,* 36 Wn. App. 182, 672 P.2d 1279 (1983).

■ It appears the trial judge considered Dr. Heap's failure to disclose the alternative of reversal between the first

and second surgeries to be a treatment claim rather than an informed consent claim. That is, Mrs. Adams testified she knew about the option and requested it, but Dr. Heap simply refused to implement that treatment. The claim was nevertheless dismissed for a lack of evidence of causation. Setting aside for the moment the question of causation, the rule is that physicians need not disclose to a patient facts of which he is already aware, *Holt v. Nelson,* 11 Wn. App. 230, 241, 523 P.2d 211 (1974) (citing *Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972)). Thus, the trial court properly dismissed this aspect of plaintiff's informed consent case, regardless of the question of causation.

The reason for dismissal of the remainder of the informed consent claim was apparently based upon asserted failure to introduce evidence of causation, discussed below, and because of inadequacies in the expert testimony.

Unlike a treatment case, whether the expert testimony was personal in nature should not be considered fatal to an informed consent claim. This is so because informed consent testimony need not rise to evidence of a standard of care. *See Smith,* at 34 (the plaintiff is "required to present *some* expert testimony . . ." (italics ours)); RCW 4.24.290.[6]

In addition, while trial courts possess a broad discretion in determining whether an expert is qualified, *Harris v. Groth,* 99 Wn.2d 438, 450, 663 P.2d 113 (1983), the trial judge here did not rule on Drs. Heinbach's and Lennard's qualifications. His ruling was based upon sufficiency of evidence, not qualification of the testifying surgeon. Thus, Richland Clinic's argument that these experts did not perform gastric bypass surgeries themselves but only worked with other University of Washington surgeons who did has little bearing upon the issues. Indeed, it was recently held that even nonphysicians could testify in a medical malprac-

---

[6]RCW 4.24.290 provides in part: "[T]he plaintiff . . . shall . . . prove . . . defendant . . . failed to exercise that degree of skill, care, and learning possessed at that time by other persons in the same profession, . . . but in no event shall the provisions of this section apply to an action based on the failure to obtain the informed consent of a patient."

tice action as to causation, reasonable prudence, and underlying facts so long as the witness was sufficiently familiar with the accepted practices of physicians. *Harris v. Groth, supra* at 450.

Dr. Lennard testified Mrs. Adams' ulcer and hernia were the result of her surgeries, but opined the risk of an ulcer was not "significant". This is sufficient expert testimony on the materiality question with respect to these risks to get it to the jury. The finder of fact could consider Dr. Lennard's opinion on "significance" in deciding whether the reasonable patient would attach significance but would not be bound. *Smith v. Shannon, supra.* The analysis is the same with respect to whether the surgical procedure was still experimental and with respect to whether the staple line would come apart and leakage could occur.

Again, with the disclosure of whether the patient had to continue dieting, the conclusion is the same since it is listed on exhibit 30 which exhibit was introduced through Dr. Lennard. Yet, this latter type of information is not a true risk or an alternative. Instead, it more readily falls under RCW 7.70.050(3)(b) (duty to disclose anticipated result of proposed treatment). Clearly, Mrs. Adams underwent major surgery because of her belief it would obviate dieting. While *Smith v. Shannon, supra,* dealt only with risks and did not address the statutory definition of "material facts" which includes anticipated results, the underlying reasoning was that medical testimony is required only where the particular fact sought to be proved is not observable by the lay person's senses. *Smith,* at 33. Therefore, regardless of exhibit 30, the evidence was sufficient to withstand the directed verdict. Mrs. Adams testified Dr. Heap gave her the impression that the surgery would solve her problems because the smaller stomach would automatically prevent excessive calorie intake. Allegedly, it was not until long after surgery that he informed her she would have to diet to maintain her weight.

Lastly, Mrs. Adams contends that causation need not be shown by direct and positive evidence.

■ In *Teig v. St. John's Hosp.*, 63 Wn.2d 369, 381, 387 P.2d 527 (1963), the rule for causation in medical malpractice actions is concisely stated:

> The appellant was not required to prove his case beyond a reasonable doubt, *nor by direct and positive evidence. It was necessary only that he show a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable.*

(Italics ours.)

Not only does sufficient testimony exist in the record to establish, if believed, that Mrs. Adams' problems came about solely as a result of one or more of her surgeries, but evidence similarly exists to show that her latter four surgeries occurred only because of the original surgery. Since plaintiff established the existence of this uninterrupted chain of circumstances, sufficient evidence exists to show the "treatment in question proximately caused [her] injury . . .", RCW 7.70.050(1)(d), for purposes of her informed consent cause of action.

The case is reversed and remanded for a new trial of plaintiff's informed consent claims.

MUNSON, C.J., and GREEN, J., concur.

Reconsideration denied July 25, 1984.