791 So.2d 614 (2001)
Shirley BRANDT
v.
Dr. Alan J. ENGLE and Boston Old Colony Insurance Company.
No. 2000-C-3416.
Supreme Court of Louisiana.
June 29, 2001.
Rehearing Denied August 31, 2001.
*615 Hugh M. Glenn, Jr., Gregory J. McDonald, New Orleans, Counsel for Applicant.
Byron J. Casey, III, New Orleans, Counsel for Respondent.
VICTORY, J.[*]
We granted a writ in this medical malpractice case to determine whether the court of appeal properly disregarded a jury verdict in favor of the defendants after finding that the trial court committed two evidentiary errors. After reviewing the record and the applicable law, we find that the court of appeal erred in reversing the jury verdict and reinstate that verdict.

FACTS AND PROCEDURAL HISTORY
Plaintiff, Shirley Brandt, was referred to defendant, Dr. Alan Engle, in August of 1993 for the treatment of corns on the second and fourth toes of her right foot. Ms. Brandt had been receiving conservative treatment, which involved debriding and padding the lesions, for several years but the corns kept returning. She was sent to Dr. Engle because he was a podiatrist who could provide alternative treatment. Although Dr. Engle told her that *616 surgery could alleviate her corns, she chose instead to continue conservative treatment at that time.
However, in August of 1994, Ms. Brandt returned to Dr. Engle and told him that she was about to lose her insurance coverage and wanted to have the surgery to relieve her corns. Dr. Engle performed arthroplasty surgery on Ms. Brandt's second and fourth toes of her right foot on August 26, 1994, and as a result of the surgery, Ms. Brandt developed "floppy toe," a condition in which she has no control over the toes on which Dr. Engle operated, and which prevents her from wearing high heels, causes pain, and prevents her from walking long distances. Ms. Brandt brought suit against Dr. Engle and Boston Old Colony Insurance Company alleging that had she been informed of the risk of developing "floppy toe" as a result of the surgery, she would not have consented to the surgery. She also alleged that she never consented to the surgery that was performed and only consented to having her bone shaved.
At trial, testimony conflicted as to whether Dr. Engle told Ms. Brandt that the surgery involved shaving of the bone or the removal of part of the bone of her toes. Ms. Brandt testified that Dr. Engle told her that he was going to make a little incision and shave the bones of her two toes in order to relieve the corns. Dr. Engle testified that he could not remember exactly what he told Ms. Brandt but that he followed his usual routine when discussing arthroplasty with her and that he had performed this procedure approximately 30 times per year since 1982. The trial court allowed Dr. Engle to testify that his usual routine was to show the patient a diagram with a chart of the foot, and describe the procedure, including informing the patient that he would make an incision over the toe and cut the tendon, then go down to the bone and take out a portion of the bone from the joint. He testified that he would also show the patient the amount of bone he would remove.
Prior to surgery, Ms. Brandt signed an informed consent form that stated that the procedure would be an "arthroplasty, PIPJ, 2nd toe, right foot, and arthroplasty PIPJ, 4th toe right foot." The form contained a description of the procedure as "take out a piece of bone from the 2nd and 4th toes in an effort to clear corns." The statutorily required material risks were included in the form and, in addition, Dr. Engle added the additional risks of infection, pain, swelling, numbness, scarring, and return of deformities.
Dr. Engle testified that he did not inform Ms. Brandt of the risk of "floppy toe" because he did not consider it a material risk of the surgery and that in all his years of performing arthroplasty, not one of his patients had developed "floppy toe." Numerous other medical experts testified at trial and all agreed that "floppy toe" was uncommon. Dr. John Walter, plaintiff's expert and a podiatrist who teaches podiatric surgery at Temple Podiatric College of Philadelphia, testified that in Pennsylvania, a doctor must inform a patient of the risk of "floppy toe" as a possible complication of arthroplasty. However, this is different than the criteria imposed by the Louisiana legislature, which only requires informing the patient of a risk that is "material." Dr. Jeffrey Sketchier, an orthopaedic surgeon practicing in Metairie, testified that he felt it was a deviation from the standard of care not to advise a patient of the risk of "floppy toe." Dr. Kenneth Quick, a podiatrist practicing in Mandeville, testified that he tells his patients that because arthroplasty involves removing a bone from the toe, that toe will never function the same as it did before the surgery. Dr. Bendel Hoover, a podiatrist *617 and a member of the medical review panel that reviewed Ms. Brandt's claim, testified that in 1994 the standard of care did not require the podiatrist to advise the patient of the possibility of a "floppy toe." Dr. William Dabdoub, a podiatrist practicing in New Orleans and Slidell, stated that although he did advise of the risk of "floppy toe" on his informed consent form, he felt that was above and beyond what a podiatrist had to do within the standard of care. All the podiatrists testified consistently that not one of their patients had ever declined to undergo the arthroplasty when informed of the risk of "floppy toe." Plaintiff proffered the testimony of Ms. Kathleen Meisner, who had undergone arthroplasty by another podiatrist in New Orleans and suffered from "floppy toe" as a result of the surgery. Ms. Meisner would have testified that had she been informed that "floppy toe" was a risk of arthroplasty, she never would have never consented to the surgery. The trial judge refused to allow Ms. Meisner to testify, finding her testimony to be irrelevant.
The jury found in favor of the defendants, finding specifically that Ms. Brandt consented to arthroplasty, rather than shaving of the bones, and that "floppy toe" was not a material risk of this procedure. The court of appeal reversed, finding that the trial court erred (1) in allowing Dr. Engle to testify as to his habit and routine in advising his patients about arthroplasty, and, (2) in excluding Ms. Meisner's testimony that she would have declined surgery had she been advised of the risk of floppy toe. Brandt v. Engle, 99-0658 (La. App. 4 Cir. 9/27/00), 771 So.2d 329 (unpublished opinion). After conducting a de novo review of the record, the court of appeal found that Ms. Brandt did not give her informed consent to the surgery and awarded her $30,000.00 in damages. Id. We granted defendants' writ application. Brandt v. Engle, 00-3416, 784 So.2d 652 (La.2/9/01).

DISCUSSION
La. R.S. 40:1299.40(A) provides the standards for written consent to medical treatment in Louisiana as follows:
A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
La. R.S. 40:1299.40(A) (before its amendment in 1995).
Plaintiff claims that although she signed an informed consent form which described the procedure as arthroplasty and removal of a bone, Dr. Engle verbally told her that he was going to shave the bone, a different procedure altogether. Thus, one of the main issues in the case was whether Dr. Engle misrepresented to Ms. Brandt that her surgery involved shaving the bone, and that her consent was *618 induced by this misrepresentation. The trial court allowed Dr. Engle to explain to the jury his routine habit and practice in describing the arthroplasty surgery to his patients prior to surgery, which included testimony that he tells his patients that he will be removing a portion of the bone and shows them on a diagram how much bone he will be removing. Dr. Engle further testified that he never tells his arthroplasty patients that he will be merely shaving the bone.
Article 406 of the Louisiana Code of Evidence provides as follows:
Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice. The evidence may consist of testimony in the form of an opinion or evidence of specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine.
Thus, under Art. 406, Dr. Engle's testimony was highly relevant to show that he routinely advises his arthroplasty patients that the surgery involves removing a bone in the toe and that his conduct with regard to Ms. Brandt was in conformity with this routine.
Relying on the case of Coscino v. Wolfley, 96-0702 (La.App. 4 Cir. 6/4/97), 696 So.2d 257, the court of appeal found that this testimony was irrelevant because he admitted that he did not inform her of the risk of "floppy toe." The court of appeal's ruling was erroneous. In Coscino, the doctor and patient agreed on the procedure to be performed, orbital decompression surgery. However, as a result of the surgery, the patient developed a cranial spinal fluid leak, a material risk about which the doctor admitted he failed to warn the patient. The court of appeal affirmed the decision of the trial court not to allow the doctor's testimony regarding the habit and practice that he used to obtain informed consent and discuss the surgery preoperatively, finding that such testimony was irrelevant in light of the doctor's testimony that he did not warn this patient about the possibility of a CSF leak. Coscino, supra.
This case is easily distinguishable from Coscino for two reasons. First, this case does not involve a material risk of the surgery. Second, Ms. Brandt alleged that there was no agreement on the surgical procedure to be performed and thus this issue was the first question on the jury interrogatory form. In answering Jury Interrogatory No. 1, "Do you find that Shirley Brandt consented to the shaving of the bone or to arthroplasty?" the jury voted that Ms. Brandt consented to arthroplasty. Dr. Engle's testimony as to his habit and routine in describing the surgery to his patients was relevant under Art. 406 to the issue. Thus, the trial court did not abuse its discretion in admitting Dr. Engle's testimony and the court of appeal's reversal of this ruling was error.
Ms. Brandt also alleged that had Dr. Engle informed her of the risk of "floppy toe," she would never had consented to the surgery.[1] Under La. R.S. *619 40:1299.40, the doctor's duty is to disclose all risks which are "material." Hondroulis v. Schuhmacher, 553 So.2d 398, 412 (La. 1988) (on rehearing) (citing LaCaze v. Collier, 434 So.2d 1039, 1045-46 (La.1983)). In Hondroulis, we explained that "a risk is material when a reasonable person in what the doctor knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy." 553 So.2d at 412. We further explained the test for materiality as follows:
The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient's position probably would attach significance to the specific risk. This determination of materiality does not require expert testimony.
Id. (Citing Harbeson v. Parke Davis, Inc., 746 F.2d 517 (9th Cir.1984) (holding that a risk is not material unless expert testimony can establish its existence, nature and likelihood of occurrence); Canterbury v. Spence, 464 F.2d 772, 786 (D.C.Cir.1972), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972) (expert testimony essential to determine existence and likelihood of risk); Adams v. Richland Clinic, Inc., P.S., 37 Wash.App. 650, 681 P.2d 1305 (1984) (holding that medical testimony is necessary to prove the first part of the test because medical training is needed to be knowledgeable about that aspect of the test); Smith v. Shannon, 100 Wash.2d 26, 666 P.2d 351, 356 (1983) (only a physician (or other qualified expert) is capable of judging what risks exist and their likelihood of occurrence); Sagala v. Tavares, 367 Pa.Super. 573, 533 A.2d 165 (1987) (the trier of fact must be supplied with expert information as to the nature of the harm and the probability of it occurring)).
In this case, the jury found that "floppy toe" was not a material risk of the surgery performed by Dr. Engle. The court of appeal reversed this jury finding because the trial court did not allow plaintiff to present the testimony of Ms. Meisner, who had undergone arthroplasty by another podiatrist and suffered from "floppy toe" as a result of the surgery. Ms. Meisner would have testified that had she been informed that "floppy toe" was a risk of arthroplasty, she never would have never consented to the surgery. The court of appeal ruled as follows:
The testimony of Ms. Meisner was relevant in the determination of whether a reasonable person in the plaintiff's position would have attached significance to the risk of floppy toes. Ms. Meisner experienced an almost identical factual situation as Ms. Brandt. Her testimony would have reaffirmed the assertion by Ms. Brandt that she would not have undergone the surgery if she had known that she might experience pain and loss of use of her foot.

*620 It is also plausible that Ms. Meisner's testimony would have aided the factfinder in its assessment of the first prong of the Hondroulis test. As explicitly stated above, only some expert testimony need be given in order to determine the likelihood of a patient getting a floppy toe. Therefore, Ms. Meisner's testimony could also be relevant in this determination.
Op. at 618-19. This holding is erroneous for several reasons.
The first part of the materiality test is "the existence and nature of the risk and the likelihood of its occurrence." In Hondroulis, we held that "`[s]ome' expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence." 553 So.2d at 412. The court of appeal's ruling that Ms. Meisner's testimony was admissible to prove the first part of the materiality test was erroneous. The court of appeal's interpretation of Hondroulis that a layperson can testify regarding the first prong of the materiality test, is refuted by the explanation in Hondroulis that only a physician or other qualified expert is capable of judging what risks exist and the likelihood of occurrence and is also belied by the cases cited in support by Hondroulis, which all held that only an expert could testify in this area. See cases cited by Hondroulis, supra at 412. Therefore, Ms. Meisner's testimony was not admissible to prove the first part of the materiality test.
Neither is Ms. Meisner's testimony admissible to prove the second part of the materiality test, which, under Hondroulis, is whether a reasonable person in the patient's position probably would attach significance to the specific risk, because Ms. Meisner was not "a reasonable person in the patient's position."[2] This Court has specifically adopted an objective standard of causation, i.e., "whether a reasonable patient in the plaintiff's position would have consented to the treatment or procedure had the material information and risks been disclosed." Hondroulis, supra; LaCaze v. Collier, supra at 1048. This objective standard was explicitly adopted "because of the likelihood of a patient's bias in testifying in hindsight on this hypothetical matter." Ms. Meisner, as a prior arthroplasty patient who had a bad result of her surgery, was not a reasonable person in Ms. Brandt's position, anymore than an arthroplasty patient who had a successful result would be a reasonable person in Ms. Brandt's position. Again, the trial court did not abuse its discretion in prohibiting Ms. Meisner from testifying.
Having found that the trial court did not abuse its discretion on any evidentiary ruling, we now review the jury verdict under the appropriate standard of review. *621 A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Thus, to reverse a trial court, the appellate court must find from the record that a reasonable factual basis does not exist for the finding and, further, that the finding is clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
On this record, we find that a reasonable factual basis exists to support the jury's finding that Ms. Brandt consented to arthroplasty and not mere shaving of the bone and that "floppy toe" is not a material risk of arthroplasty. Ms. Brandt signed a consent form which contained a description of the surgery as "take out a piece of bone from the 2nd and 4th toes in an effort to clear corns" and Dr. Engle testified that it was his habit and practice to inform his arthroplasty patients that he was going to remove a bone from their toe. The jury, as the fact-finder that determines credibility, was reasonable in accepting this evidence over the testimony of Ms. Brandt. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990) ("where there is conflict in the testimony, reasonable evaluations of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are reasonable"). Further, substantial evidence was presented at trial that "floppy toe" is neither a frequent, nor serious, complication of the surgery. Each podiatrist at trial testified that "floppy toe" was not a serious complication and that he had never had a patient refuse arthroplasty after being informed of the risk of "floppy toe." One expert testified that "floppy toe" was really no worse than corns. All of this evidence provides a reasonable factual basis for the jury's determination that "floppy toe" was not a material risk of arthroplasty. Therefore, we reverse the judgment of the court of appeal and reinstate the jury verdict in favor of Dr. Engle.

CONCLUSION
In this informed consent case, Dr. Engle's testimony as to his habit and routine practice in informing arthroplasty patients of the type of surgery he is performing and the pertinent details of that surgery is relevant where the patient alleges that the doctor's verbal description of the surgery varied from that described on the informed consent form and signed by the patient. Further, a prior arthroplasty patient whose surgery resulted in "floppy toe," the same complication as that experienced by the plaintiff, is not competent to testify as to whether "floppy toe" is a material risk of arthroplasty, as she is neither a "physician or other qualified expert ... capable of judging what risk exists and the likelihood of occurrence," such that her testimony would be relevant to the first prong of the materiality test, nor is she a "reasonable person in the patient's position," such that her testimony would be relevant to the second prong of the materiality test. Therefore, the trial court did not abuse its discretion in allowing the testimony of Dr. Engle and in disallowing the testimony of Ms. Meisner.

DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed and the jury verdict in favor of defendants is reinstated.
REVERSED; JURY VERDICT REINSTATED.
NOTES
[*] Retired Judge Robert L. Lobrano, assigned as Justice Pro Tempore, sitting for Associate Justice Harry T. Lemmon; Judge Felicia Toney Williams, of the Second Circuit Court of Appeal, assigned as Justice Pro Tempore, sitting for Associate Justice Bernette J. Johnson.
[1] Courts in Louisiana have developed the following four-part test which a plaintiff must meet in order to prevail in a claim for failure to provide informed consent:

1. The existence of a material risk unknown to the patient;
2. A failure to disclose a risk on the part of the physician;
3. That the disclosure of the risk would have led a reasonable patient in the patient's position to reject the medical procedure or choose another course of treatment; and
4. Injury.
Boudoin v. Crawford and Marshall, Ltd., 97-224 (La.App. 5 Cir. 1/14/98), 709 So.2d 798; Cox v. Administrators of the Tulane Educational Fund, 97-2350 (La.App. 4 Cir. 7/1/98), 716 So.2d 441; Hidding v. Williams, 578 So.2d 1192 (La.App. 5 Cir.1991).
[2] By Act 1093 of 1990, the Legislature amended La. R.S. 40:1299.40(E)(2)(a) to read as follows:

In a suit against a physician or other health care provider involving a health care liability or medical malpractice claim which is based on the failure of the physician or other health care provider to disclose or adequately disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or other health care provider, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent. (Emphasis added).
We express no view on whether this statute alters Hondroulis's rule that the health care provider disclose all risks to which a reasonable person in what the provider knows or should know to be the patient's position would attach significance in deciding to undergo the surgery or treatment, as Ms. Meisner was not a "reasonable person" under either test.