SUSAN M. CHEHARDY, Judge.
|2This is a medical malpractice suit in which the plaintiffs claims were dismissed after a bench trial. The plaintiff appeals. We affirm.
The issues are whether the radial nerve palsy that developed in the plaintiffs right arm after shoulder surgery was either caused or worsened by the defendant surgeon’s failure to x-ray the surgery site, and whether the defendant provided sufficient information to enable the plaintiff to give informed consent as required by law.
Due to rheumatoid arthritis that severely affected her right shoulder joint, Jeannine Boudreaux underwent shoulder replacement surgery by Dr. Melvin Parnell, an orthopedic surgeon, on August 15, 2001. The procedure is known medically as hem-iarthroplasty of the right shoulder with replacement of the humeral head. Following the surgery Ms. Boudreaux developed radial nerve palsy that ultimately became permanent and disabling.
In hemiarthroplasty, the surgeon uses a medical drill to ream a canal down into the top portion of the upper arm (humerus), which is filled with surgical cement. A prosthetic device consisting of an artificial shoulder “ball” and a long shaft is then inserted into the cement-filled canal. The prosthetic device replaces the natural mechanism of the upper arm where it sits inside the shoulder socket. | ...Fractures of the upper arm are a known risk of this type of surgery, as is extrusion of the cement through the fracture (with potential neurological injury).
It is not disputed that Ms. Boudreaux’s humerus was fractured during the surgery on August 15, 2001, that a large amount of surgical cement leaked through the fracture, and that Dr. Parnell did not inform her of the fracture or the cement extrusion that occurred during the surgery. Dr. *1183 Parnell was not aware that this had happened. As a result, a large amount of extruded cement hardened around the radial nerve in her upper arm.
Although Ms. Boudreaux’s radial nerve was functioning immediately after the August 15, 2001 surgery, she was having difficulty extending her fingers. In the medical records, Dr. Parnell documented her difficulty as a form of radial nerve palsy. Dr. Parnell did not order x-rays of her arm at any time, either immediately after the surgery or at several more postoperative visits over the course of several months, although her inability to move her hand and fingers progressively became worse.
Approximately eight months after the surgery, Ms. Boudreaux required treatment at the emergency room of St. Tammany Parish Hospital because of sudden pain in her right arm and shoulder. Hospital x-rays disclosed there was a substantial amount of cement surrounding her right humerus. Even after Dr. Parnell was given a copy of the hospital x-rays on her next visit to him, he did not order x-rays or other tests of her arm to determine the severity of the condition. Ms. Boudreaux subsequently learned that the damage to her radial nerve is permanent.
By the time of trial, Ms. Boudreaux had very little movement in her right arm, wrist and fingers. Her right arm is in a state of paralysis. She was 42 years old at the time of the original surgery.
| PROCEEDINGS BELOW
Ms. Boudreaux filed a complaint with the Louisiana Patient’s Compensation Fund and her claim underwent medical review panel proceedings. The medical review panel concluded the evidence does not support the conclusion that Dr. Parnell failed to meet the applicable standard of care as charged in the complaint. The panel found that the conduct complained of was not a factor of any resultant damages to plaintiff.[1]
Thereafter Ms. Boudreaux filed this lawsuit against Dr. Parnell and his insurer, Louisiana Medical Mutual Insurance Company. She asserted that Dr. Parnell was negligent and breached the standard of care because he failed to perform a post-surgery x-ray of the site to detect the fracture and he failed to properly treat the radial nerve palsy she suffered as result of the cement extrusion. She alleged she will be required to undergo additional surgeries in the future. She also alleged she was not provided with sufficient information before the surgery to enable her to give valid informed consent for the procedure.
In answer to the suit, Dr. Parnell responded that all members of the medical review panel had concurred that he met the applicable standard of care as an orthopedic surgeon in his treatment of the plaintiff. He denied that the plaintiff suffered any complications through his fault, asserting any such resulted from natural causes and illnesses or through an act or *1184 omission of some third person or of the plaintiff herself.
|BThe case was tried on July 26, 2010, in a bench trial. The court took the matter under submission and rendered judgment in favor of the defendant on October 8, 2010. In written reasons for judgment, the court made the following findings, in pertinent part:
All of the medical experts agreed that bone fractures and cement extrusions are known complications of shoulder replacement surgery. They also concurred that the plaintiff was an appropriate candidate for shoulder replacement surgery and that the injury at issue occurred during the surgery. The plaintiffs expert, Dr. Frank Barnes, testified in his deposition that he had no criticisms of Dr. Parnell’s surgery. The only criticism that Dr. Barnes raised was the failure to take an x-ray within 24 hours after surgery. The defendants’ experts testified, however, that the standard of care does not require a post-operative x-ray. These experts further testified that even if Dr. Parnell had completed a post-operative x-ray, it would not have changed the outcome because the damage had already occurred to the radial nerve.
Furthermore, all of the medical experts, including Dr. Barnes, agreed that the standard of care with respect to the treatment of radial nerve palsy is to wait and monitor the patient’s recovery. The evidence indicated that an EMG study of the nerve would not provide any insight as to whether an injury occurred until at least eight weeks following the surgery. The surgery occurred on August 15, 2001, and Dr. Parnell’s October 4, 2001 office notes state that he would recommend EMG and nerve conduction studies if he did not find a significant change in the radial nerve findings by the next visit. However, the plaintiff failed to return for her next follow-up visit with Dr. Parnell, and did not return to see Dr. Parnell again until April 30, 2002.
Plaintiff invites this Court to find that medical malpractice occurred despite the lack of expert evidence as to a breach of any standard of care. This is not an obvious case of negligence by a health care provider, particularly since bone fractures and cement extrusions are known complications of shoulder replacement surgery. The Court has no choice but to dismiss Ms. Boudreaux’s medical malpractice claims due to her failure to prove that Dr. Parnell committed a breach of the standard of care.
| fiWith respect to the lack of informed consent claim, the plaintiff complains that Dr. Parnell failed to inform her of the risk of cement extrusion. She further contends that her consent form is invalid because Dr. Parnell’s name is not filled in on the consent form and he did not sign the form.
[[Image here]]
Dr. Parnell’s office notes from August 13, 2001, two days prior to the surgery, indicate that he discussed the shoulder replacement procedure surgery with her in detail. The plaintiff signed an informed consent form prior to the surgery. While the form did not specifically refer to cement extrusion, it explained that neurological injuries and bones fractures were a possible complication of the surgery. The plaintiff testified that she did not read the form and nothing prevented her from doing so. Furthermore, the law cited above does not require the name of the doctor or the doctor’s signature to be included on the form.
When a patient consents in writing to medical treatment pursuant to Louisiana’s Uniform Consent Law, the plaintiff *1185 must present evidence that the consent was induced by a misrepresentation of material facts.... Plaintiff failed to prove any misrepresentations and therefore, the Court must also dismiss her informed consent claim.
ISSUES ON APPEAL
On appeal, the plaintiff asserts the trial court was clearly wrong in the following respects: (1) concluding that the plaintiff suffered permanent, complete and irreparable paralysis of her arm immediately during surgery, as opposed to injury that developed over time with a likelihood of full recovery if the cement were removed; (2) concluding that the defendant did not violate any duty to the plaintiff, when the defendant failed to perform any x-rays of the plaintiffs right shoulder either after surgery or during three post-op visits; (3) failing to find that the defendant owed a duty to the plaintiff that was breached to advise her after surgery of the possibility that fracture and cement extrusion could have occurred during surgery; (4) concluding there was no expert testimony to establish a breach of the standard of care, when more than one expert opined that post-operative xjrays7 are standard, especially if the patient is suffering complications from surgery; and (5) concluding that the defendant complied with the Informed Consent Law.
In opposition to the appeal, Dr. Parnell argues that the trial court’s judgment is fully supported by the evidence introduced at trial, it is not clearly wrong or manifestly erroneous and, therefore, it should not be disturbed. He contends further that the plaintiff failed to carry her burden of proof under La. R.S. 9:2794 and that she failed to prove that Dr. Parnell did not obtain informed consent for the surgery.
EVIDENCE
Dr. Parnell’s notes state that on July 2, 2001, Ms. Boudreaux came to him complaining she had had severe pain in her shoulder for more than a month, could not raise her arm above her shoulder, and the pain was getting worse. The doctor’s notes of his physical examination comport with her complaints. He concluded that due to her severe arthritis, she was a candidate for a shoulder replacement. Dr. Parnell had performed orthopedic surgery on Boudreaux four times previously.
The doctor’s notes indicate that Ms. Boudreaux returned on August 13, 2001, and that he discussed the procedure in detail with her, showed her x-rays of other patients who had had shoulder replacements, and told her what to expect post-operatively. The surgery was scheduled for August 15, 2001.
Ms. Boudreaux testified, however, that she never made an office visit on August 13, 2001; further, she said, Dr. Parnell never discussed the risks of surgery with her in detail. She recalled only one discussion of her shoulder, in July 2001. She testified that on August 13, 2001, she was at the hospital most of the day, doing the prep work for the surgery — undergoing blood tests and chest x-rays, and signing papers for the anesthesiologist and the hospital.
|RShe admitted that she did not read the paperwork. She knew the paperwork was her consent to have the surgery and that if she did not sign the papers, she could not have the surgery. She said the only person who discussed risks of surgery with her was the anesthesiologist, and he talked only about the risks of anesthesia.
Ms. Boudreaux said she did make an office visit on August 14, 2001, because her ankle — on which Dr. Parnell had performed surgery previously — was bothering her and she was afraid of undergoing the *1186 shoulder surgery with her ankle hurting. She called the doctor’s office about it on August 13, and they gave her an appointment for the next day, August 14. She saw the doctor on August 14 and he reassured her that the ankle would not be a problem during the surgery. She denied there were any discussions of the shoulder surgery during her visit on August 14.
The next day, August 15, 2001, Ms. Bou-dreaux underwent the shoulder replacement surgery. During the procedure, Dr. Parnell cut open the right shoulder, removed the shoulder joint, and inserted an artificial shoulder joint. To do this he hand-reamed a canal into the humerus, mixed surgical cement, and filled the canal with cement. He then inserted the prosthesis, which consists of a long shaft that is inserted into the hollowed-out humerus and a ball that replaces the shoulder joint. After the cement hardened, the shoulder was reduced (re-aligned). Ms. Boudreaux tolerated the surgery with no complications and was in stable condition in recovery. Dr. Parnell’s post-surgery discharge summary states,
Postoperatively she has done very well. She has minimal discomfort. She did develop a radial nerve palsy and has a flicker of extension of the long finger, but sensation in the distribution of the radial nerve appears to 19be normal, and I feel the patient more than likely has just a neuropraxia.[2]
Overall the hospital course was one of continued improvement. At the present time it is felt that her medical problems are stable and she is discharged at this time in satisfactory medical condition.
Ms. Boudreaux testified that when she woke up after the surgery, she not only had surgery pain in the shoulder, but also pain right above her elbow joint. She said it was “extremely painful” and that it hurt from her elbow all the way down her arm to her wrist, hand, and fingers. She said she let the doctor know about it, and he told her it most likely was swelling and bruising from regular manipulation during surgery and it would start getting better. She was discharged from the hospital on August 17, 2001.
According to Ms. Boudreaux, she saw Dr. Parnell for her first post-operative visit on August 28, 2001. She said they discussed the pain she was having and the fact that it was in her elbow rather than her shoulder. Her shoulder was still sore from the surgery, but most of her pain was in the elbow and hand, and she was losing the ability to open up her hand.
In Dr. Parnell’s notes, however, he states that on August 28, 2001, “The patient called and wanted to know if she could change her medication from Oxycontin to something not as strong.... She said that her arm is not hurting as much because she has not been using it as much.... ” The doctor’s notes do not indicate there was any office visit on August 28th.
Instead, the doctor’s notes indicate that September 4, 2001, was Ms. Boudreaux’s first post-operative visit. The notes state,
The patient ... reports that she is doing okay following discharge from the hospital. Physical [inexamination shows the incision to be healed.... There is marked limitation of shoulder motion with some pain at extremes of motion and a lot of this is due to muscle weakness. With the right wrist allowed to fall into plantar flexion, the patient is unable to extend the fingers of the right *1187 hand[;] however with the wrist in the neutral position, the patient can extend the fingers of the right hand. I told her that the nerve is still functioning, but I think that everything is just bruised and contused and ... this should continue to improve with time and therapy.
Ms. Boudreaux testified she complained to Dr. Parnell that she was in pain. She was unable to extend the fingers of her right hand with the right wrist in flexion. She testified that Dr. Parnell told her the condition was neuropraxia, and that it resulted from bruising due to manipulation during surgery. He said it would heal gradually and ordered physical therapy three times a week for the next month. She was to return in one month.
The medical record shows that Ms. Bou-dreaux returned on September 11, 2001, because the incision had opened up somewhat. Dr. Parnell determined that she appeared to have had a stitch suture reaction. He removed the remaining subcutaneous sutures and instructed her on daily wound care. His notes state she had an appointment to see him in one week (which would have been September 18, 2001).
According to Dr. Parnell’s notes, on September 18th Ms. Boudreaux called the doctor’s office to request a refill of her Lortab medication, which was given to her. The notes also state that she called again on September 28 to request another refill of the Lortab, but the refill was denied because it was too soon.
The notes indicate that Ms. Boudreaux did not return for a follow-up visit until October 4, 2001, at which time the doctor noted:
The patient ... reports that she is doing a little bit better. Physical examination shows mild decreased range of motion of the right shoulder with some mild discomfort at the extremes of motion. The stability of the ^prosthesis appears to be good. She is developing increasing strength and tone in the muscles about the right shoulder[;] however she still does not have active extension of the fingers of the right hand, and the radial nerve palsy remains unchanged.
Dr. Parnell ordered electrical stimulation be added to Ms. Boudreaux’s physical therapy. He told her to return in three weeks and, if there was no significant change in the radial nerve findings, he would recommend electromyography and nerve conduction studies. According to Dr. Parnell, Ms. Boudreaux had a visit scheduled for October 25, but did not show, and another visit scheduled for November 13, but she did not show up for that one either. Ms. Boudreaux did not return to Dr. Parnell until more than six months after the October 4 visit.
Ms. Boudreaux testified she stopped going to physical therapy after only five treatment sessions because she was doing physical therapy on her own at home. She said she failed to return to Dr. Parnell because she was not aware of the “urgency” to do so, despite the scheduled appointments.
Approximately eight months post-surgery, Ms. Boudreaux heard a cracking sound when she lifted a box. She sought treatment at a hospital emergency room, where x-rays revealed there was a fracture in the humerus and there was hardened surgical cement surrounding the entire distal humerus.
She took the x-rays to Dr. Parnell in a visit on April 30, 2002. Dr. Parnell’s notes state,
She went to the emergency room and states that they told her that she had pulled muscles off the bone and now it fell down her arm. She denies any previous problems with her right shoulder recently....
*1188 Physical examination shows right shoulder motion limited to approximately 50 percent of normal. The stability of the prosthesis appears to be good. Significant discomfort, however, is noted at the extremes of motion. The patient does have retraction of the biceps muscle belly distally, consistent with a biceps tendon rupture. |12There is severe pain with stress loading of the midportion of the right humerus and the x-rays show the presence of a nondisplaced fracture through the humerus, in addition to the biceps tendon rupture....
I told the patient that although she has a ruptured tendon, the crack was probably the bone. There is some bone cement present distal to the tip of the prosthesis and apparently some of this extravasated from the shaft of the femur at the time of surgery[;] however now it is serving as a protective effect and it has essentially provided external fixation to the fracture site. I told the patient that the alignment looks pretty good and as far as the bone, nothing has to be done, we just have to let it heal. With regards to the biceps tendon, I told her that she could elect to undergo surgery for a tenodesis of the tendon to return the muscle to a more normal position or she could just simply let things heal and once the fracture is healed, begin physical therapy.... The patient would prefer to go the nonsurgical route, but I told her that if she changes her mind at any time, we could always consider surgery. I will see her back in two weeks for repeat x-rays and evaluation.
Ms. Boudreaux never returned to Dr. Parnell after the April 2002 visit. She testified she did not return to him because of the “mysterious diagnosis” of her x-rays. She said she wanted a definite answer as to what was going on with her arm.
Instead, she sought a second opinion from Dr. H. Reese Plauché, an orthopedic surgeon. Ms. Boudreaux testified she first saw Dr. Plauché on May 2, 2002. He took x-rays on that date. She said he told her that the fracture in the humerus went down her arm and that the mass she had been told was “fallen tendons” actually was cement that had come out and encase the bone all the way around. She said by that time she was having more difficulty with raising her arm, moving it from the elbow down, opening and closing her hand, and flexing her fingers.
Ms. Boudreaux continued treatment by Dr. Plauché until 2003. She said he first recommended she see a neurologist for electrical stimulation to see if her radial nerve or any of the other nerves were still working, and to see what nerve | ^function remained. Ms. Boudreaux saw Dr. Michael Fisher, a neurologist, and thereafter sought further treatment on her own.
Dr. Plauché testified that Ms. Bou-dreaux first came to see him in May 2002, complaining of pain in her right shoulder and her right hip. According to the notes, he said, she had a fracture during the surgery and some of the cement extruded through the fracture site. Dr. Plauché felt that Ms. Boudreaux most likely sustained a thermal necrosis to the radial nerve, with subsequent radial nerve palsy. He explained that the surgical cement gets very hot when it goes from a soft state to hard. It came out of a hole in the bone, apparently near where the radial nerve runs around that bone. He concluded that the heat from the cement injured the nerve, which would have had to occur during the surgery. It takes about 10 minutes for the cement to become firm.
Dr. Plauché testified that other causes of a radial nerve palsy would be from the nerve being stretched or moved around the mass created by the cement, or from *1189 swelling or external pressure on the nerve. In his opinion, it was because of the cement. For the cement to come out of the bone, there had to be a hole somewhere. He said this is a known complication, especially in rheumatoid patients. It can occur even with the exercise of the greatest care.
Dr. Plauehé did not recommend excision of the cement at that point, because it was a year from the injury. By that point it was stable and hard. He saw no point in taking it out; rather, he felt there probably was more risk with surgery, because scar tissue could fracture the bone and damage the muscle.
Dr. Plauehé testified that if an x-ray had been taken post-operatively after the surgery in August 2001, the cement would have been visible. It would not have made a difference, however, because the damage to the nerve from the heat already taken place. Dr. Plauehé last saw Ms. Bou-dreaux in October 2003.
114Pr. Plauehé testified that usually one would take an x-ray after the surgery. He said it is standard in the recovery room, typically to make sure the ball of the implant is in the socket. He admitted that if the patient is complaining of limited movement of the fingers, there is more reason to do an x-ray.
Dr. Plauehé said that, like Dr. Parnell, he would not have sent Ms. Boudreaux for nerve conduction studies within the first few weeks after surgery. Instead, he would first institute physical therapy. He said conservative treatment is the best course, then nerve conduction tests. Only after that would he discuss surgical decompression, because chiseling out cement during repeat surgery is risky. There is the risk of fracture, plus the risk of further injury to the nerve.
The operating surgeon, Dr. Parnell, testified he was not aware of any bone fracture or extravasation[3] of the cement after the surgery. The only excess cement he could see was at the top and he removed that. He could see only the bone at the top of the arm — the shoulder and about two inches of adjacent bone. He stated he did not take a post-operative x-ray of the shoulder because it was not necessary. He testified that at East Jefferson Hospital the decision whether to do a postoperative x-ray is the surgeon’s choice. He said an x-ray would just show the position of the prosthesis, and the surgeon who placed the prosthesis knows the position without an x-ray.
Dr. Parnell testified that if Ms. Bou-dreaux had returned for the office visits scheduled in late October and/or early November that she missed, he would have referred her to a neurologist for testing. He said it takes a minimum of six weeks after surgery before nerve conduction tests become positive, and it can take up to ten weeks.
|15Pr. Parnell testified that when he viewed the emergency room x-rays at Ms. Boudreaux’s visit on April 30, 2002, he did not see a fracture, but he could see some cement in the anterior. He concluded that cement from the August 15, 2001 surgery had extravasated outside the bony canal. That can happen without any negligence; there are cases in which there was no fracture, but cement had been extruded through the foramen (a hole in the bone through which the blood vessels exit).
Dr. Parnell explained that the radial nerve runs closest to the bone, so it tends *1190 to be the nerve most commonly involved by cement extravasation. If the cement contacts the nerve while it is curing, it causes a chemical burn, actually a thermal burn, because the cement gives off heat while it is curing. Nerve fibers are extremely delicate; just a little pressure can cause a malfunction of the nerve. They are probably the most sensitive tissues in the body.
Dr. Parnell said that if he had taken a postoperative x-ray on August 15, 2001, and had seen that cement extravasated outside the bony canal, he would have given it the same conservative treatment. He said you give it time to heal on its own; if it does not, then you perform nerve conduction studies, which determine the further course of treatment. He said you do not go in and strip the cement away from the nerve. To go back in too soon would increase the risk of injury, because of the swelling associated with the surgical procedure. There is a much higher complication rate, he testified, if you try to go back in right away. The treatment is observation and, if there is no improvement, then electromyography and nerve conduction studies about nine or ten weeks post-operatively, and continuation of physical therapy. If there still is no function in the nerve, then you can perform tendon transfers to try to regain function. '
11fiDr. Parnell felt the shoulder replacement was a success, because even the patient admitted she had improved. He also said that the radial nerve sustained thermal injury immediately upon extravasation of the cement, which would have occurred while Ms. Boudreaux was still under anesthesia in the operating room. The outcome would have been the same, even if he had taken a post-operative x-ray.
Eventually, however, after researching specialists on her own, Ms. Boudreaux went to New York City for corrective surgery by Dr. Robert Hotchkiss, an orthopedic surgeon who specializes in corrective surgery. Dr. Hotchkiss attempted to repair the nerve damage and paralysis, but that surgery ultimately was unsuccessful.
Dr. Frank L. Barnes testified as an expert orthopedic surgeon on behalf of the plaintiff. He is an orthopedic surgeon licensed in Texas, with an office in the Houston area. He testified he has performed hemiarthroplasties. He was critical of Dr. Parnell for not taking a postoperative x-ray of the plaintiff within 24 hours of surgery. He testified that x-rays are routine in most orthopedic surgeries so “you can be sure you did what you thought you did,” and that “there are no problems you need to go back and correct.” He said it is mandatory at most hospitals in Houston.
Dr. Barnes opined that what happened with the plaintiff is that when the prosthesis was inserted, the cement broke out through the side of the bone and flowed down the arm almost to the elbow. He said that the nerve injury was caused primarily by the pressure of the cement against the radial nerve, that it happened at the time of surgery, and that the radial nerve was damaged right away. He said if you wait too long to repair it, there is more scarring inside the radial nerve and gradually it will get worse.
117Pr. Barnes said if he had performed the surgery, had taken an x-ray within 24 hours after the surgery, and had seen the extruded cement, initially he would have observed the arm closely to see if there would be recovery. After three to six weeks, he would have obtained electromyo-graphic testing to see if there was any recovery of nerve function. At that point he would have considered re-exploring the nerve to assess its condition and to see if it could be improved.
*1191 Dr. Barnes admitted that fracture of the humerus with a prosthesis is a known complication, as is extrusion of the cement outside the bony canal, and that these can happen even with the best of care. He agreed that Dr. Parnell’s original recommendation that the plaintiff undergo shoulder surgery was correct, and he agreed with Dr. Parnell’s surgical technique as described in the post-operative report.
Dr. Barnes opined, however, that after six weeks Dr. Parnell should have re-explored the plaintiffs radial nerve, which most probably would have shown pressure on the nerve from the cement. He said if the excess cement had been removed it would have given the plaintiff a better chance to recover the nerve.
Dr. Barnes admitted that heat from the cement, combined with pressure, could aggravate injury to the nerve. He admitted that heat itself could cause injury that would be instantaneous.
Dr. Donald Faust, a member of the medical review panel, was called by Dr. Parnell to testify as an expert orthopedic surgeon.[4] Dr. Faust stated the panel’s conclusion was that it was an unfortunate outcome, but it was not malpractice by Dr. Parnell. He said the evidence does not support the conclusion that Dr. Parnell |isfailed to meet the applicable standard of care. Dr. Faust further stated he is still of that opinion. He believes the radial nerve palsy was probably a thermal injury due to the leakage of the cement. The bone is porous in everybody, and in rheumatoid arthritis patients it is even more porous. He said that when they put in the cement, it leaked out through the little pores throughout the humerus. He did not think there is anything Dr. Parnell could have done to prevent it. The fact that cement leaked out, he said, does not prove that Dr. Parnell’s care was substandard.
Dr. Faust said it is a known complication, and the radial nerve is most at risk. He testified there is no really good treatment approach to repair the nerve, only tendon transfers if there are muscles available. He did not think the nerve could be fixed.
Dr. Faust stated it is not below the standard of care not to take a postoperative x-ray; that is a call for the surgeon to make. In his opinion, the main reason to take post-surgery x-rays is to use them as teaching tools for surgical residents. Dr. Faust said that even if an x-ray had been done and Dr. Parnell had seen cement extravásate outside the bony canal, his treatment options were zero. It wouldn’t have worked to take the patient back into surgery, which could have caused arm problems. The thermal nerve injury probably occurred in the first 20 minutes to an hour after it was put in. Dr. Faust testified the only thing is to hope it would recover on its own due to a neuropraxia, which is a possibility. Exploring it surgically would jeopardize that route.
Dr. Faust concluded that the plaintiff was an appropriate candidate for shoulder replacement because, due to her rheumatoid arthritis, she likely would have lost functionality of the shoulder in absence of shoulder replacement surgery. He said the best clinical approach for the plaintiff would have been to do nothing, |1flor to *1192 undergo tendon transfers. He stated, “If Dr. Parnell had shot the x-ray, I don’t think he should have done anything differently than what he did.”
Dr. Felix Savoie, III, another member of the medical review panel, also was called by the defense to testify as an expert orthopedic surgeon.[5] Dr. Savoie estimated he has performed thousands of shoulder replacement surgeries in his 30 years of practice. He testified that radial neuropa-thy is a known complication, and that neu-ropraxic injury can occur either from retraction during surgery or from a variety of problems, even with the best care and skill by the surgeon.
Dr. Savoie, who teaches at Tulane Medical School, said that at the Tulane hospital they usually take an x-ray when the patient returns for the first post-operative visit. He said the reason, however, is because Tulane is a teaching institution, with residents and fellows in the clinic at all times. The x-rays are a teaching tool. He did not think it was below the standard of care for Dr. Parnell not to take a postoperative x-ray.
Dr. Savoie commented he had reviewed the x-rays from St. Tammany Parish Hospital and he could not see any fracture on them. In the absence of a fracture, the cement had to extravásate through the porous holes in the bones, which are osteo-mylastic due to her rheumatoid arthritis.
Dr. Savoie testified he was unable to say for certain what caused the injury to the plaintiffs radial nerve. It could be a thermal injury, or a neuropraxia caused from having retractors up high during surgery. He said it most likely is a thermal injury because “it just went out and stayed out.” If he had seen a post-operative x-ray of the patient showing the extravasated cement, he would have done nothing except to tell the patient that if she felt a bump in her arm, it was the cement.
DftAccording to Dr. Savoie, the treatment recommendation for radial nerve palsy and extruded cement is to watch the nerve. Usually it will come back within eight to twelve weeks, but it can take up to two years. By eight weeks, if the patient still is not recovering, then you do electrom-yography and a nerve conduction study. Prior to that it is a waste of time. After the electromyography, a neurologist can tell what occurred and the chances of its returning. If it is a thermal injury, it usually is not going to recover.
Dr. Savoie also pointed out that after the corrective surgery by Dr. Hotchkiss, the plaintiff was “in a mess.” Prior to Dr. Hotchkiss’s surgery, she had a good result from Dr. Parnell’s surgery; if she had impaired function of the radial nerve, she either could have done nothing or had tendon transfers. Dr. Savoie said it would have been below the standard of care for Dr. Parnell to take the plaintiff back into surgery to scrape out the cement. Dr. Savoie disagreed with Dr. Barnes’s conclusion that Dr. Parnell deviated below the standard of care by not taking post-operative x-rays.
LAW AND ANALYSIS
La. R.S. 9:2794 sets out the plaintiffs burden of proof in a malpractice action against a physician, as follows in pertinent part:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 87:1261 et seq., ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinari *1193 ly exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
12i(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(8) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La. R.S. 40:1299.40 of Louisiana’s Uniform Consent Law provides in pertinent part:
A. (1) Notwithstanding any other law to the contrary, written consent to medical treatment means the voluntary permission of a patient, through signature, marking, or affirmative action through electronic means ..., to any medical or surgical procedure or course of procedures which sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is evidenced by a signature, marking, or affirmative action through electronic means, by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent, by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
In Brandt v. Engle, 00-3416, p. 7, n. 1 (La.6/29/01), 791 So.2d 614, 618, our supreme court stated,
The jurisprudence has enunciated the following four-pronged test that a plaintiff asserting an informed consent claim must satisfy:
1. The existence of a material risk unknown to the patient;
2. A failure to disclose a risk on the part of the physician;
| ¾⅞3. That the disclosure of the risk would have led a reasonable patient in the patient’s position to reject the medical procedure or choose another course of treatment; and
4. Injury.
The fact there is an injury during or following medical care or treatment is not by itself an indication of substandard care that either the physician or hospital provided. Campo v. Correa, 2001-2707, pp. 14-15 (La.6/21/02), 828 So.2d 502, 512. The mere fact of an injury or accident does not raise a presumption or inference of negligence on the part of the healthcare provider. Galloway v. Baton Rouge General Hospital, 602 So.2d 1003, 1008 (La.1992); La. R.S. 9:2794(C).
“The plaintiff must establish ... a causal connection between the physician’s alleged negligence and the plaintiffs injuries resulting therefrom.” Pfiffner v. *1194 Correa, 94-0924, p. 8 (La.10/17/94), 643 So.2d 1228,1233.
In a medical malpractice action, the plaintiff must show that as a result of the defendant’s negligence he suffered injuries that would not otherwise have occurred. Plaintiff need not show that defendant’s conduct was the only cause of the harm nor must he negate all other possibilities. Rather, he must show by a preponderance of the evidence, or more probably than not, that he suffered the injury because of defendant’s conduct. Where different medical procedures or different health care providers may have concurred to create or worsen the harm, a tortfeasor is responsible not only for the injuries directly resulting from his substandard conduct but for subsequent treatment by health care providers who seek to resolve the original harm. This is so whether or not the subsequent treatment is rendered negligently. However, if the subsequent treatment is deemed negligent, then the original physician and the subsequent ones are solidarity liable for the total harm. Thus, the risk of further injury from treatment of health care providers whose services are made necessary by the original negligent act is within the scope of the risk foreseeable by the original tortfeasor.
| ¡¡aMaxwell v. Soileau, 561 So.2d 1378, 1387 (La.App. 2 Cir.1990), writ denied, 567 So.2d 1123 (La.1990) and 567 So.2d 1124 (La.1990).
A reviewing court may not set aside a district court’s finding of fact in the absence of manifest error or unless it is clearly wrong, and where there is conflict in the testimony, inferences of fact should not be disturbed upon review, even though the reviewing court may feel that its own evaluations and inferences are as reasonable. Breach of duty and cause in fact are factual questions to be determined by the factfinder. [Citations omitted.]
Linnear v. CenterPoint Energy Entex/Reliant Energy, 2006-3030, p. 11 (La.9/5/07), 966 So.2d 36, 44.
Applying these principles to the facts before us, we find no manifest error in the trial court’s determination that the plaintiff failed to carry her burden of proof by a preponderance of the evidence, either as to causation of the injury itself or as to failure to give informed consent.
The district court’s written reasons for judgment set forth fully the court’s analysis of the expert testimony. There is no basis on which to find the court was clearly wrong in determining there was no evidence of any breach of the standard of care by Dr. Parnell.
Similarly, we find no error in the district court’s determination that the plaintiff failed to prove that Dr. Parnell did not obtain her informed consent. The plaintiff admitted she had not read any of the forms that she signed, and she did not establish there was any misrepresentation of material facts.
DECREE
For the foregoing reasons, the judgment is affirmed. Costs of appeal are assessed against the plaintiff-appellant.

AFFIRMED

.In support of their conclusion, the panel gave the following reasons:
1. We acknowledge that this is an unfortunate outcome for this patient.
2. The patient was informed of the risks of the surgery in the informed consent which she signed on 8-13-01. The stated risks included "infection, neurologic injury, vascular injury, ligament or tendon injury, fracture of the bone.”
3. Cement extrusion is a known complication in this type of surgery, as is intraop-erative or perioperative fracture, both of which occurred in this case.
4. While it is common practice to obtain x-rays postoperatively, the fact that Dr. Parnell did not do so would not have changed the medical management of this case, and this omission was not the cause of the patient’s difficulties.

. Neuropraxia is “a condition in which a nerve remains in place after a severe injury although it no longer transmits impulses." Mosby’s Medical Dictionary (8th edition, 2009), available at http://medical-dictionary. thefreedictionary.com/neuropraxia.

. Extravasation is “a discharge or escape, as of blood, from a vessel into the tissues; blood or other substance so discharged.” Dorland's Medical Dictionary for Health Consumers (2007), available at http://medicaldictionary. thefreedictionary.com/extravasation.

. La. R.S. 40:1299.47(H) provides,
Any report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law, but such expert opinion shall not be conclusive and either party shall have the right to call, at his cost, any member of the medical review panel as a witness. If called, the witness shall be required to appear and testify....

. We note this physician’s name is spelled in the record as "Sadoie,” but we have changed the "d” to a "v" based on reliable information that the correct spelling is "Savoie.”