984 So.2d 170 (2008)
In re MEDICAL REVIEW PANEL OF Hedda NEVILLE, individually and on Behalf of the Minor, Wayne David Neville
v.
CHARITY HOSPITAL OF LOUISIANA AT NEW ORLEANS.
Hedda Neville, individually and on Behalf of the Minor, Wayne David Neville
v.
Medical Center of Louisiana, Formerly Charity Hospital of Louisiana at New Orleans.
Nos. 2007-CA-0900, 2007-CA-0901.
Court of Appeal of Louisiana, Fourth Circuit.
April 23, 2008.
*171 Edward P. Gothard, Nowalsky, Bronston & Gothard, Metairie, LA, for Hedda Neville, individually and on behalf of the Minor, Wayne David Neville.
Gregory C. Weiss, Weiss & Eason, L.L.P., Mandeville, LA, for Defendant/Appellant.
(Court composed of Judge MAX N. TOBIAS, JR., Judge EDWIN A. LOMBARD, Judge LEON A. CANNIZZARO, JR.[*]).
MAX N. TOBIAS, Jr., Judge.
The defendant/appellant, Charity Hospital and Medical Center of Louisiana at New Orleans,[1] formerly Medical Center of Louisiana at New Orleans (hereinafter, "Charity"), appeals from a judgment rendered in favor of the plaintiff/appellee, Hedda Neville, individually and on behalf of the minor, Wayne David Neville (Ms. Neville and Wayne, respectively). After reviewing the record and applicable law, we affirm the judgment.
On 22 August 1990 at 9:30 a.m., Ms. Neville, then twenty years old, arrived at Charity in labor. Wayne was born at Charity on 23 August 1990 at 12:25 a.m., after having been delivered by an emergency cesarean section ("c-section") necessitated by fetal distress. Wayne was critically ill at birth. He suffered from low levels of oxygen in utero, as established by a low pH level.[2]
Wayne's asphyxia caused him to aspirate, or inhale into his lungs, amniotic fluid containing meconium (fetal feces). This occurred either while he was in utero or immediately after birth when he took his first breath. Meconium aspiration caused lung damage and additional oxygen deprivation, which resulted in severe and permanent brain damage.
It is undisputed that during the first 13.5 hours of Ms. Neville's labor, nothing indicated that Wayne was in distress. No medical findings were present to establish a belief that Wayne would be near death at birth and suffer from permanent brain damage.
Wayne weighed 8 pounds 10 ounces at birth. At the time of trial in 2005, Wayne, then 14 years of age, was functionally illiterate; he will likely never read or write. He suffers from impaired judgment, poor memory, poor attention, and poor impulse control. Wayne cannot fully appreciate right from wrong and will never be able to independently support himself.
The case was heard by bench trial on 11 April 2005. On 8 July 2005, the trial court *172 rendered judgment in favor of Ms. Neville and awarded: $8 million in general damages; $1,052,393 for future lost wages; $25 million for future rehabilitation and residential care; $45,000 for past medical expenses; court costs; expert witness fees; and judicial interest from the original filing of a request for a medical review panel. However, in accordance with the Medical Malpractice Act for State Services, La. R.S. 40:1299.39, et seq., the award was reduced to $500,000 representing the statutory "cap" in damages, plus past medical expenses of $45,000. The state was also ordered to pay all future medical and related expenses, court costs and expert witness fees, and judicial interest from the original filing of the request for a medical review panel.
In its reasons for judgment, the trial court reviewed the evidence and briefly outlined the testimony of the witnesses. Specifically, the court found that:
[T]he staff physician was not available to authorize a cesarean section between 11:00 p.m. and midnight on 22 August 1990. Wayne Neville was in fetal distress during that time period, which required an emergency cesarean section. The conduct of the obstetrical residents and attending obstetrician fell below the standard of care by not delivering the child sooner, via cesarean section, because of the fetal distress. The deviation from the standard of care by the obstetrical residents and attending physician caused the fetus to suffer from acute perinatal asphyxia, which caused meconium aspiration, lung damage and ultimately permanent, severe and irreversible brain damage. Further, the conduct of the pediatric resident responsible for the resuscitation of the baby fell below the standard of care, and that this negligence also caused, contributed to or worsened the asphyxia of the newborn, causing, contributing to or worsening the meconium aspiration, lung damage and brain damage.
The Court finds the testimony of plaintiff's expert obstetrician, Dr. Frank Battaglia, and expert neonatologist, Dr. Marcus Hermansen, to be based upon the facts contained in the record and accepted medical science. The Court finds the testimony of both of the experts to be credible and convincing.
The Court finds the testimony of the defense witnesses, who were largely the physicians providing care to Ms. Neville and her child, not credible or persuasive. No defense witness had any recollection of the actual events, and thus did not dispute the factual testimony of Ms. Neville in any way. The defense witnesses' testimony contained numerous misstatements and contradictions of the facts as shown in the record. No defense witness presented a credible explanation of the events of August 22-23, 1990, or the harm experienced by Wayne David Neville, based upon the facts of record or reasonable medical research or science.
The trial court also found inconsistencies, contradictions, and irregularities in the medical records:
The fetal monitor strips were required to be part of the medical chart; if the defense theory of the case is to be believed, the strips alone would have exculpated the defendant obstetricians from negligence. The Court makes no presumptions or assumptions as to what the strips would have shown. The Court considers the fact that the strips are missing along with the other issues raised by the chart itself. One medical chart entry by Dr. Vance was altered, by some unknown person, to change the meaning of the sentence to its diametric opposite. This is ominous and inexcusable no matter what the ultimate significance *173 of the sentence may have been. Other entries are scratched out and changed. There are clear contradictions between the events as described by the obstetrical residents and as described by the pediatric residents. Finally, the chest x-rays, central to the defense theory of causation, were also missing.
After considering all of the defense testimony, including the deposition transcripts submitted, as well as the trial exhibits, the Court finds that the defense witnesses were not credible and the defense theories not proven or justified by the evidence.
Considering the totality of all of the testimony and exhibits, and the credibility of the witnesses as observed at trial, the Court finds that Plaintiff clearly met her burden of proving the medical malpractice and liability of defendants more probably than not.
This appeal followed.
Charity has assigned three errors for our review. First, it argues that the trial court erred in finding improper OB monitoring in the hours preceding Wayne's birth. Next, it contends that the trial court erred in finding that a delay occurred in Ms. Neville's emergency caesarean section. Finally, Charity claims that the trial court erred in finding improper pediatric care to Wayne upon his birth.
We apply the manifest error/clearly wrong standard of care to this case. Rosell v. ESCO, 549 So.2d 840 (La.1989). See also Brandt v. Engle, 00-3416, p. 10 (La.6/29/01), 791 So.2d 614, 621 ("A court of appeal may not set aside a trial court's finding of fact in the absence of `manifest error' or unless it is `clearly wrong.' Thus, to reverse a trial court, the appellate court must find from the record that a reasonable factual basis does not exist for the finding and, further, that the finding is clearly wrong.")
In a medical malpractice action, the plaintiff has the burden of proving: (1) the degree of knowledge or skill possessed or degree of care ordinarily exercised by physicians within that medical specialty, i.e., the standard of care; (2) that defendant either lacked such degree of knowledge or skill, or failed to use reasonable care and diligence along with his best judgment in application of that skill, i.e. a breach of the standard of care; and (3) that as result, injuries were sustained that would not have otherwise occurred, i.e., causation. La. R.S. 9:2794; Williams v. Memorial Medical Center, 03-1806, pp. 15-16 (La. App. 4 Cir. 3/17/04), 870 So.2d 1044, 1054.
The first two assignments of error, improper monitoring and delayed c-section, are intertwined; thus we address them together.
The medical records entered into evidence indicate that Ms. Neville presented at Charity at approximately 9:30 a.m. on 22 August 1990 in active labor. Her membranes broke while in the waiting room, but the records do not note moderate meconium in the amniotic fluid until 4:00 p.m. Ms. Neville was initially placed on an external fetal heart monitor to keep track of the fetus' heart rate ("FHR"), and given a drug to speed up the delivery. Subsequently, Ms. Neville was placed on an internal fetal monitor. During the first 13.5 hours of Ms. Neville's labor, the FHR ranged between 130 and 160 beats per minute ("bpm"). At approximately 11:00 p.m., Charity's records indicate that the FHR was in the 170s (170-79 bpm). The chart does not reflect a further notation until midnight, when the FHR dropped into the 60s and 70s for three to four minutes. At 12:05 a.m., Ms. Neville was rushed to the operating room for an emergency c-section. Wayne was born at 12:25 a.m.
*174 Ms. Neville testified that she arrived at Charity at approximately 9:30 a.m. that morning. She was initially placed in the observation room until being admitted and taken to the labor room. Although she was told of the presence of moderate meconium while in the observation room, she was not informed that meconium could indicate fetal distress. She testified that she had been receiving regular prenatal care into her seventh month of pregnancy, until Medicare stopped paying the doctor.[3] Once she was placed in the labor room, a monitor keeping a record of the heart rates of her and the baby was placed at the foot of her bed and she was instructed to read the numbers. She further testified that she was able to observe the numbers from 11:00 p.m. until midnight, the hour at issue. She stated that the FHR dropped below 100 bpm for over an hour (11:00 p.m. until midnight), and claimed to have observed a FHR of 52 bpm just before she was taken into the operating room.
Ms. Neville stated that the fetal monitor was frequently read and the numbers recorded in her chart. She also saw that the monitor recorded the numbers on the fetal monitoring strips that were examined by various medical personnel. In addition, she had immediate access to her labor nurse, Mary Ann Fischer, R.N., while in the labor room. When the FHR began dropping after 11:00 p.m., the medical personnel became very concerned. They tried unsuccessfully to reposition her in various ways and placed her on oxygen to bring up the numbers. She was told that a doctor was not available to perform the c-section at that time. From 11:00 p.m. until she was taken to the operating room, Ms. Neville had a nurse and medical students attending to her.
Ms. Neville presented the testimony of two experts, Frank Battaglia, M.D., an obstetrician, and Marcus Hermansen, M.D., a pediatrician/neonatologist. Dr. Battaglia testified that a normal FHR should be in the range of 110-160 bpm. He stated that a FHR in the 170s bpm is considered abnormally elevated and known medically as "tachycardia," which may be the first sign of fetal intolerance to labor and/or insufficient oxygen ("placental insufficiency"). He testified that a baseline FHR above or below the normal range required Charity to monitor the mother and child more closely and intervene as necessary for the health and well being of both. Dr. Battaglia explained that the continuance of fetal intolerance results in a slowing heart rate (decelerations) or fetal bardycardia.
The record reflects a similar sequence of events. Wayne's heart rate slowed to dangerous levels as the result of placental insufficiency, until the emergency c-section. Both Drs. Battaglia and Hermansen testified that this is a gradual process that took place between 11:00 p.m. and the time of his birth; they agreed that earlier intervention would have prevented the ultimate aspiration and brain damage.
According to Ms. Neville's experts, Wayne was born near death more than 1.5 hours after the distress began. His initial blood gas showed a depressed pH indicating high acid resulting from low oxygen. These experts agreed that his condition and blood work were consistent with acute prolonged in utero asphyxiation. They also agreed that Wayne's distress began at approximately 11:00 p.m. and, therefore, Wayne should have been delivered long before Charity's doctors took action.
*175 Based on the same medical records, Charity's witnesses, primarily past and present Charity medical personnel, painted a different picture.
Nurse Fischer testified that she was never at a place where she could not hear Ms. Neville's fetal monitor; she had the sound on the monitor to maximum volume and was stationed immediately outside the labor room. Nurse Fischer was responsible for the four women in that room, including Ms. Neville. She was specifically trained to identify heart rate decelerations and call a physician immediately.
All readings of the fetal monitoring strips were contemporaneously documented in the physician progress notes, nurse notes, and nurse flow sheets. Nurse Fischer testified that the FHR were read and recorded at least once an hour. She disputed Ms. Neville's testimony that the FHR began dropping shortly after 11:00 p.m. and remained below 100 bpm for most of that time. Nurse Fischer testified that had that been the scenario, she would have called for a physician long before midnight. Nurse Fischer, however, admitted that she had no independent recollection of Ms. Neville's labor and that anything not recorded in the medical records would be speculation.
Charity's medical personnel testified consistently that Wayne's aspiration of meconium occurred pre-admission and thus was a chronic condition that could not have been prevented. In other words, something happened to Wayne prior to his mother's admission into the hospital, causing asphyxia of such severity that he aspirated amniotic fluid containing meconium. However, none of the witnesses could surmise what that event may have been or fully explain why no signs of fetal distress were detected until shortly before Wayne's birth. Their opinion was based on the appearance of meconium staining on parts of the infant's body, the elevated level of "nucleated red blood cells"[4] and the x-rays of Wayne's lungs showing "massive, severe, dense, bilateral infiltration of old meconium into the lungs." Based on these findings, Charity argues that Wayne was in fetal distress before Ms. Neville presented at Charity and, therefore, Charity did not improperly monitor Ms. Neville's labor. In addition, Charity contends that its medical personnel adhered to the standard of care with regard to Wayne's delivery.
Unfortunately, there will never be a conclusive determination of what actually occurred during the 1.5 hours preceding Wayne's birth. As the trial court found, Charity was under a duty, pursuant to its internal procedures, the national standard of care for hospitals, and Louisiana law, to maintain the fetal monitor strips generated during the labor of Ms. Neville for one year. Charity never produced the fetal monitor strips, despite multiple requests for them within one year of 22 August 1990. The trial court found that Charity made no showing that the strips were accidentally lost. Additionally, chest x-rays taken of the infant at Charity, and radiologist reports of those x-rays, should also have been kept permanently by Charity, but were never produced.
Based on the conflicting testimony and arguably equally plausible explanations for the plaintiff's damages, we cannot find that the trial court erred in finding that Charity *176 improperly monitored Ms. Neville's labor and unreasonably delayed in performing the emergency c-section. In addition, we find no error in the finding that these breaches in the standard of care caused Ms. Neville's and her son's damages. Thus, these assignments of error are without merit.
The last allegation of medical malpractice concerns the pediatric care administered to Wayne immediately after his birth. Dr. Hermansen testified that the standard of care required an initial and immediate intubation of Wayne to clear the meconium out of his airway via an ET tube, followed by stimulation to encourage the infant to take his first breath. According to Cynthia Rome, M.D., the chief pediatric resident working that evening, she performed the immediate, initial suctioning of Wayne, followed by stimulation and subsequent resuscitative efforts. She testified that there was a minimal amount of moderately thick meconium suctioned from the baby's throat. It was only after the intubation that she stimulated the baby to take his first breath. Dr. Rome's actions are recorded in the medical records. It is this documentation that was inexplicable altered. However, based on a reading of the note before alteration, Wayne was not placed on oxygen during the resuscitation, a contradiction to Dr. Rome's testimony.
Also contradicting Dr. Rome's testimony was the OB note written an hour after delivery by Susan Emily Vance, M.D., an obstetrics and gynecology resident at Charity. Dr. Vance testified by way of deposition that was entered into the record.[5] This note contained the observations of Ghazeleh Hafizi, M.D., who was then a seven-week intern. According to Dr. Hafizi, the note reflects that stimulation preceded intubation. At trial, Dr. Hafizi explained that the notation "no intubation" meant that the baby was not intubated and placed on oxygen; she never meant to imply that the pediatric doctors treating Wayne did not intubate for suctioning of the meconium before stimulation occurred. However, Dr. Hafizi's testimony confirms that the baby was not immediately placed on oxygen after the meconium was suctioned from his trachea.[6] This discrepancy is further highlighted by the fact that Dr. Vance's note was changed from "O2 noted not to be connected to ambu bag while resuscitation being performed," to "O2 noted not to be disconnected to ambu bag while resuscitation being performed." [Emphasis added.] Dr. Vance testified that the addition was not in her handwriting. We agree with the trial court that the addition of "dis" completely alters the meaning of the sentence.
Dr. Vance's note made after Wayne's birth reflects that after Ms. Neville was taken into the delivery room, a fetal monitor was reattached. At that time, the FHR was in the 150s prior to the start of the c-section. When questioned in her deposition why the doctors choose to continue with the c-section, Dr. Vance stated *177 that it was done due to Ms. Neville's failure to progress with labor for an hour before that.
After reviewing the record, and in light of the conflicting testimony throughout the trial, we cannot say that the trial court erred in finding that Charity committed medical malpractice. The trial court made credibility determinations, believing the plaintiff's witnesses and disbelieving the defendant's witnesses. Based on the clearly wrong/manifestly erroneous standard, we find no error on the part of the trial court.
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[*] This opinion was approved by Judge Leon A. Cannizzaro, Jr. prior to his retirement.
[1] La. R.S. 40:2002.5.
[2] Low oxygen (asphyxia) causes an increase in acid (acidosis), which causes the pH to fall. This is measured by sampling the blood from the umbilical cord immediately after delivery.
[3] The record implies that the doctor's medical records do not support Ms. Neville's testimony, however, the doctor was deceased at the time of trial and his medical records were excluded from evidence.
[4] Nucleated red blood cells are very young blood cells that are formed in response to fetal distress. Dr. Hermansen stated that these cells can build up quickly or slowly. Relying only on this measure, he could not opine how long the asphyxia was present. However, defense witnesses testified that it takes the fetus at least 14 hours to begin to produce these cells, thus pointing to a pre-admission event that began the fetal distress.
[5] Dr. Vance testified that she remembered only parts of that night's events. She stated that "[I] kind of, sort of remember what was going on, but I don't have a real clear recognition of it." However, in reading her note made at 1:30 a.m. on 23 August 1990, she observed that it had been altered, but did not know by whom.
[6] Dr. Hafizi also testified that fetal monitors were never placed at the foot of a patient's bed, primarily for lack of space in the labor room. Dr. Hafizi stated that all fetal monitors were placed at the top of the bed near the patient's head, pointing away from the patient, so that doctors and nurses could have immediate and easy access to the readings and strips. We find that, even without relying on Ms. Neville's testimony concerning the FHR after 11:00 p.m., we reach the same conclusion as the trial court.