STATE OF LOUISIANA IN THE INTEREST
OF M.N. & B.N.

NO. 21-CA-634

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE JEFFERSON PARISH JUVENILE COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 20-CC-72, DIVISION "A"
HONORABLE ANN MURRY KELLER, JUDGE PRESIDING

January 07, 2022

**SUSAN M. CHEHARDY**
**CHIEF JUDGE**

Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and John J. Molaison, Jr.

**REVERSED AND REMANDED**
**FOR NEW ADJUDICATION HEARING**
    **SMC**
    **FHW**
    **JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Nancy J. Vega
Chief Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLANT,
STATE OF LOUISIANA IN THE INTEREST OF M.N. AND B.N., JR.
 Honorable Paul D. Connick, Jr.
 Thomas J. Butler
 Elizabeth B. Curren
 Douglas E. Rushton

COUNSEL FOR DEFENDANT/APPELLEE-2ND APPELLANT,
M.N. AND B.N., JR.
 Fatmeh T. Ali

COUNSEL FOR PARENT/APPELLEE,
B.N., FATHER
 Douglas L. Harville
 Jennifer G. Womble

**CHEHARDY, C.J.**

In this Child in Need of Care ("CINC") action, the juvenile court granted the father's motion for directed verdict immediately after the State rested its case, but before the children were permitted to offer evidence. Finding error in the juvenile court's ruling, we reverse the judgment and remand for retrial.

FACTS AND PROCEDURAL HISTORY

The minor children, M.N. and B.N.,[1] are the subject of these juvenile court proceedings that the State instigated in response to allegations that the children's father and his wife, the children's stepmother, physically and emotionally abused them, with additional allegations that the mother's boyfriend, "Jordan," was sexually molesting M.N.[2] The State's petition alleged that M.N. and B.N. were children in need of care pursuant to La. Ch. C. art. 606 (A)(1) and (2).[3] The petition alleged charges against both parents as follows:

> The agency is now concerned that both the mother and father are separately coaching the child to lie out of revenge against their former spouse or to gain ground in domestic proceedings.
>
> [M.N.] admitted to DCFS that her father and stepmother forced her to say that her mother's friend "Jordan" had put his finger in her vagina. The child now claims the mother does not even have a boyfriend. [M.N.] also said she was being physically abused by [father and stepmother]. [M.N.] said that the father hit her with a wooden back

---

[1] To protect the identity of the minor children involved, they will be referred to using initials. U.R.C.A. 5-1, 5-2; *L.R.F. v. A.A.*, 13-797 (La. App. 5 Cir. 2/26/14), 133 So.3d 716, 717 n.2, *writ denied*, 14-655 (La. 4/17/14), 138 So.3d 633, *cert. denied*, 574 U.S. 871, 135 S.Ct. 224, 190 L.Ed.2d 134 (2014). The parents will be referred to as father, mother, and stepmother.

[2] Father and mother also are engaged in separate divorce proceedings in the district court, including a battle over custody and child support. According to the record in the present case, both the father and the mother had filed various protective orders in the district court proceedings, which have remained contentious.

[3] The relevant provisions of La. Ch. C. art. 606 provide:
    A. Allegations that a child is in need of care shall assert one or more of the following grounds:
        1. The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, by a person who maintains an interpersonal dating or engagement relationship with the parent or caretaker, or by a person living in the same residence with the parent or caretaker as a spouse whether married or not, and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.
        2. The child is a victim of neglect.

scratcher and her stepmother held her head under water in the swimming pool several times. … Police now suspect the mother is coaching the child to lie about the physical abuse in retaliation for the sexual molestation claim.

Coaching a child to lie about physical and sexual abuse—especially against a parent—has been shown to cause extreme emotional damage to a child. Hence, the agency immediately tried to institute a safety plan but both parents refused. Child protection workers were also concerned that the four-year-old son [B.N.] was being emotionally harmed by the parents' conduct.

The children were placed in the care of DCFS. The juvenile court subsequently granted the State's motion to dismiss the allegations against the mother after determining that she was not a safety risk to her children. Custody of the children was revoked from DCFS and returned to the mother. The State's allegations involving the father remained.

At a pre-adjudication hearing in January 2021, the children, through their appointed counsel, requested a closed-court hearing, which the juvenile court granted, stating that it would allow the attorneys to question the minors during the adjudication in accordance with La. Ch. C. art. 661 B and that the father would not be allowed to be present during the children's testimony. At the same pre-adjudication hearing, the juvenile court refused to permit the State to introduce the forensic interview tapes of M.N. as evidence at the adjudication. The State sought supervisory review from this Court, which granted the State's writ application, reversed the juvenile court's ruling, and remanded for further proceedings. *State of La. in the interest of B.N. and M.N.*, 21-C-27 (La. App. 5 Cir. 3/9/21) (unpub.).[4]

---

[4] This Court's ruling noted that the juvenile court "apparently relied on allegations made by counsel for the father, which were factually disputed by the State, without taking testimony or other evidence. Regardless, this sanction was ordered without reasonable notice and a contradictory hearing to determine whether the State committed a sanctionable discovery violation, and whether the exclusion of the forensic interview tape is an appropriate sanction in this CINC proceeding, if any violation has in fact occurred." 21-C-27, p. 2.

*Adjudication Hearing*

The adjudication hearing commenced on June 17, 2020 but the juvenile court continued the hearing to July 16, 2020. At the outset of the hearing, the juvenile court granted the father's request to sequester all witnesses and denied the State's request to exempt Dr. Ann Troy from the sequestration order. The State then presented testimony from the mother and from a number of parties familiar with the investigation of the abuse allegations.

The mother testified that the divorce proceedings with the father had become contentious, and that protective orders had been filed with regard to the mother's child support claims. Counsel for the father objected, and the juvenile court sustained the objection that the evidence related to child support and protective orders was "irrelevant," although the court indicated it would allow the State to proffer the evidence. When the State attempted to proffer additional testimony on this issue, counsel for the father again objected and the court sustained the objection.

The mother further testified that M.N. told her she "had been hit" multiple times and was "called names" while at her father's house. The mother stated that M.N. told her the stepmother had "plucked her vagina," to which counsel for the father objected on the basis that this allegation was not in the petition. The juvenile court sustained the objection and directed the State to examine the witness as to the physical abuse.[5]

---

[5] The mother also testified that she and her ex-husband did not agree about the medical attention M.N. should receive for her physical and emotional health in response to their divorce, explaining that the father had cancelled a doctor's appointment scheduled for M.N., which required the mother to take M.N. to the emergency room to be seen for a "backed-up colon." The mother also learned for the first time in May 2020 that M.N. had been seeing a counselor for more than a year. The mother indicated that M.N. and B.N. were with their father and step-mother in March 2020 through August 2020, due to the Covid-19 pandemic and as a result of the abuse allegations.

The mother stated that she learned in May 2020 that the Department of Children and Family Services (DCFS) had opened an investigation after M.N. told therapists that she (M.N.) had been molested by "Jordan" while in her mother's care, and that her mother had abused her. The mother testified that she had been living with her parents since the divorce and denied having a boyfriend or dating anyone after the divorce.

The mother further testified that she was concerned for M.N.'s safety in the father's presence, that M.N. was afraid her father would "take" her, and that the father does not care for M.N. properly and has physically abused her. The mother claimed that she has to constantly reassure M.N. that her father is not going to take her. According to the mother, M.N. said that her father made her lie, that she is afraid he will whip her, and that she does not want to be alone with him. M.N. has also told her mother than she has trouble sleeping because her father is "in my head" and "in my mind." On cross-examination, the mother testified that she did not believe that the father should be involved with his children without supervision. She indicated that the children do not ask to see their father and do not say anything positive about him.

The State next questioned Ms. Quintella Carter, an investigator with DCFS, who testified that DCFS received a report in September 2020 that the mother's boyfriend had been sexually abusing the six-year-old girl with his fingers.[6] Ms. Carter testified that she also was concerned about allegations of physical abuse from the father and step-mother. Because there were allegations of abuse against both parents, the State obtained custody of the children and placed them in foster care until the charges against the mother were dropped and custody was returned to her. Ms. Carter testified that she was concerned about the father coaching his

---

[6] The agency had received a report with the same allegations in May 2020, but the agency closed the investigation as inconclusive.

children to make false allegations against the mother so that he could obtain full custody, because M.N. told Ms. Carter that "her dad was trying to take her away from her mom." Ms. Carter testified that M.N. told her that the stepmother held her head under water and that the father would withhold food if M.N. did not say what she was told to say. On cross-examination, Ms. Carter testified that the police also suspected that the mother was coaching the children to lie about the physical abuse of their father in retaliation for the sexual molestation claims. Ms. Carter explained that DCFS validated the case for "dependency," based on the children being placed in custody; the agency did not validate the allegations of emotional or physical abuse, emotional maltreatment, or medical neglect.

Ms. Tiffany Nelson testified that she is a child welfare supervisor at DCFS, which requires her to supervise family visits, observe parent-child interaction and engagement, and make recorded notes of her observations. Ms. Nelson testified that Ms. Dalton, who observed certain family visits between the father and children, expressed to Ms. Nelson a concern that the father was whispering in the child's ear about the mother, and what to say.

Dr. Ann Troy, a professor of forensic nursing and a nurse practitioner at the Audrey Hepburn Care Center who has seen M.N. previously, stated that the first few visits to the Care Center were the result of allegations of emotional and physical abuse at the father's house, specifically that another member of the father's household had hit, pushed, and called M.N. names.[7]

---

[7] On a subsequent visit to the Care Center, M.N. gave Dr. Troy detailed allegations of sexual abuse by the mother's boyfriend, Jordan. Dr. Troy indicated that M.N.'s body language "was an outlier" and that Dr. Troy had never seen a child "so forthcoming and so detailed without more prompting being required." Dr. Troy explained that when interviewing other children who described sexual abuse, she had not seen the body language that M.N. exhibited – talking about sexual abuse and looking at her fingernails and very quickly giving details of the abuse. Dr. Troy explained: "you don't anticipate a six-year-old telling you the eye color of the person who's put their finger in their vagina." Dr. Troy indicated that she did not include in her notes her opinion that M.N. was possibly coached, and she does not include such allegations in other cases because she does not want to influence any additional investigation of the matter.

Sergeant Joshua Bermudez with the Jefferson Parish Sheriff's office testified that on May 20, 2020, he received from DCFS a disclosure of M.N.'s allegations of sexual abuse. He made an appointment for M.N. at the Care Center and observed M.N.'s interview, indicating that she had been touched on her vagina by "Jordan." After searching several police databases, Sgt. Bermudez could find no proof that Jordan existed and found no other men related to the mother. He also learned that at the time of the report of abuse, the children were living with their father.

Detective Phillip Hedrick with the Jefferson Parish Sheriff's Office testified that on September 14, 2020, he received a complaint of sexual abuse of M.N. perpetuated by her mother's boyfriend. Over the course of his investigation, he learned that there have been multiple reports made by the parents since 2018. Ultimately he arrested the father and stepmother for two counts of false swearing in violation of R.S. 14:126.1, but he made no arrests in connection with the sexual abuse allegations. He was present when M.N. was interviewed [for the second time] as to the sexual abuse allegations at the Children's Advocacy Center on October 1, 2020, and he observed M.N. "completely deny" everything that she had said in her prior interview.

At the conclusion of Detective Hedrick's testimony, the State rested and counsel for the father moved for a directed verdict on the basis that the State had failed to prove its case. The Court indicated that the evidence presented by the State "does not warrant an adjudication of child in need of care or family in need of services" and dismissed the petition. The juvenile court stated: "There's no question in my mind that this court doesn't belong in this case. It needs to stay in the 24th [JDC]," and further stated: "the Court does not find that the State proved anywhere close to a preponderance of the evidence that this gentleman is guilty of anything.... Or, well, not guilt. That there would be any risk of the child - - to the

child to return the whole case to the 24th J.D.C., which is where it should have been and where it should have stayed, in this Court's humble opinion." In written Reasons for Judgment, the juvenile court stated:

> [T]he State **did not** meet its burden of proving, even by the comparatively low burden of a mere preponderance of the evidence, that the children B.N., Jr. and M.N. are in need of care as to their father. … There was no evidence presented that the children had been harmed by their father or that there was a risk of harm to the children from their father. … The State did not prove its allegation that the father had coached the children; on the contrary, this Court found the testimony of the child [in the second forensic interview] when she stated that her father had instructed her to lie to be *less* sincere, and more rehearsed, than her testimony in her previous [forensic] interview. The only evidence the State presented against the father was testimony by the mother, who had much to gain from doing so.

LAW AND ANALYSIS

The State assigns three errors on appeal. First, the State argues that the juvenile court erred in granting the father's motion for a directed verdict and dismissing the State's petition when there was sufficient evidence that the father coached M.N. to fabricate a sexual molestation claim, withheld food, and whipped the children to force them to lie. Second, The State argues that the juvenile court erred in (i) preventing the State from proffering evidence of the underlying legal dispute between the father and mother, and (ii) invoking the "four corners rule" to exclude testimony of medical neglect and of the father's coaching on the basis that those allegations were not included in the State's petition. Third, the State argues that the court erred in sequestering the State's forensic child abuse expert, Dr. Ann Troy, because the Code of Evidence exempts experts from sequestration.

The minor children, M.N. and B.N., also appealed, arguing that the juvenile court applied the wrong standard on directed verdict, and the court erred in preventing them from introducing evidence at the adjudication hearing, including the children's own testimony through a *Watermeier* hearing. Pursuant to La. Ch. C.

art. 662, a child in a CINC proceeding may introduce evidence, call and cross-examine witnesses, and be heard on his or her own behalf. Counsel for the children indeed participated in the examination of witnesses who were called in the State's case. The children argue that the juvenile court's consideration of their plight should be foremost in a CINC hearing, but the court did not have all the evidence before it when it granted the father's motion for a directed verdict. The children argue that at the very least, M.N. was being emotionally abused by being forced to lie about being molested. Additionally, the children argue that the evidence offered at trial shows that the father emotionally and physically abused the children.

The father, as appellee, argues in response to the appellants' arguments that the conclusory findings of DCFS – that the "only valid" finding against the father was for dependency – obviate the need for the juvenile court to admit any additional evidence. According to the father, the juvenile court correctly determined that the State failed to meet its burden of proving that M.N. and B.N. are children in need of care. The father contends that "it was reasonable" for the juvenile court to grant a directed verdict/involuntary dismissal and dismiss the State's CINC petition.[8] Finally, the father contends that the children waived their right to present evidence at the adjudication hearing because their attorney did not object when the court granted the father's motion for a directed verdict.

*Child in Need of Care (CINC) Proceedings*

Child in Need of Care proceedings are governed by La. Ch. C. arts. 601 *et seq.* and commenced by the State to "protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect, or exploitation and who may be further threatened by the conduct of others, by providing for the reporting of suspected cases of abuse, exploitation, or neglect of

---

[8] The father also makes a number of additional allegations that are not supported by the evidence in the record before this Court.

children; by providing for the investigation of such complaints; and by providing, if necessary, for the resolution of the child in need of care proceedings in the courts." La. Ch. C. art. 601; *State in Interest of C.C.*, 20-307 (La. App. 5 Cir. 3/17/21), 316 So.3d 154, 168-69. The health, safety, and best interest of the child are the paramount concern. *State ex rel. D.A.*, 10-1040 (La. App. 5 Cir. 6/14/11), 70 So.3d 960, 963.

La. Ch. C. art. 662, entitled "Right to present evidence and examine witnesses," states: "The child and his parents may introduce evidence, call witnesses, be heard on their own behalf, and cross-examine witnesses called by the state." Pursuant to the relevant provisions of La. Ch. C. art. 661 B, a child may choose to testify as to his wishes, and the court *shall* consider his testimony in the matter:

> … A child below the age of twelve years shall be present in court upon the request of counsel for the child or the court. **If the child is present in court, he may choose to testify as to his wishes, and the court shall consider his testimony in the matter.** Any testimony given by a child may be taken by a videotaped interview or by close-circuit television, as authorized by Chapter 8 of Title III of this Code, or by an in-chambers conference attended only by the judge and court reporter and by counsel for the child, for the petitioner, and for the parents.

(Emphasis added).

*Directed Verdict/Involuntary Dismissal*

At the close of the State's case, counsel for the father moved for a directed verdict. We treat the father's motion for a directed verdict as a request for involuntary dismissal, which applies to a bench trial, rather than a directed verdict, which applies when trial is conducted before a jury. *See State in the Interest of J.A.*, 99-2905 (La. 1/12/00), 752 So.2d 806, 809 n.5 ("Although counsel for L.A. termed the oral motion as a directed verdict, being a bench trial, the trial court properly treated the motion as an involuntary dismissal."); *Wise v. J.E. Merit*

*Constructors, Inc.*, 97-0684 (La. 1/21/98), 707 So.2d 1214, 1217 n.2 ("Defense counsel actually moved for a directed verdict. However, since this was a non-jury trial, it is clear that counsel's procedural intent was to move for an involuntary dismissal under La. Code Civ. P. art. 1672 B.").

The appropriate standard in determining whether an involuntary dismissal should be granted is whether the plaintiff has presented sufficient evidence in his case-in-chief to establish his claim by a preponderance of the evidence. *Machado v. Baker Concrete Constr.*, 13-273 (La. App. 5 Cir. 10/30/13), 128 So.3d 477, 481. An appellate court may not reverse a ruling on a motion for involuntary dismissal unless it is manifestly erroneous or clearly wrong. *Id*. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. *Evans v. Lungrin*, 97-541 (La. 2/6/98), 708 So.2d 731, 735.

The record in this case reveals that the children, as intervenors, contemplated offering the testimony of M.N. at the adjudication—in addition to the video forensic interview evidence of M.N. presented by the State—when the juvenile court granted the children's motion for a *Watermeier* hearing filed on December 17, 2020.[9] On January 14, 2021, the juvenile court granted the children's motion, stating: "Court does not have a problem with the attorneys questioning the minor in a closed hearing in accordance with Ch. C. art. 661B, but will not allow the father to be present during the child's testimony." In addition, counsel for the children explained at the outset of the July 2020 adjudication that the children were "present today in court, but are in the D.A.'s office in the playroom." Immediately after the juvenile court granted the father's motion for a "directed verdict," the State asked the court for written reasons; the court "note[d] the State's objection"; and counsel

---

[9] *See Watermeier v. Watermeier*, 464 So.2d 301 (La. 1985). In their motion the children claimed that they "will not be able to speak freely within a contentious courtroom atmosphere where they may be required to speak negatively of their father within his presence." The motion also stated that the mother "does not want her children to speak in court in front of her or the children's father," and that the children would be comfortable speaking outside of their presence.

for the children indicated that the children were "very adamant about their fear of returning to the father."

Based on the record before us, we find the juvenile court clearly erred in granting a "directed verdict" and dismissing the State's petition before hearing from counsel for the children. These adjudication proceedings were not about exonerating the father of any alleged guilt but instead about determining whether the children's health, safety, or welfare are at risk of substantial harm. La. Ch. C. art. 601. While our ruling does not foreclose the possibility of granting a motion for involuntary dismissal in CINC proceedings in the future, and although we recognize that the State retains the burden of proving a child's CINC status pursuant to La. Ch. C. art. 665, in this instance we find the juvenile court erred when dismissing the State's petition without giving the children, as intervenors, an opportunity to offer additional evidence – an opportunity that the juvenile court had previously recognized when granting the children's motion for a *Watermeier* hearing in January 2021.

The children's right to be heard at the adjudication is legislatively protected through La. Ch. C. arts. 661 B and 662. Counsel for the children noted on the record at the beginning of the adjudication that the children were present in court, but at the close of the State's case, the juvenile court immediately dismissed the proceedings before the children had an opportunity to offer any additional evidence, including the testimony of M.N. in a closed-court setting. Under La. Ch. C. art. 662, if the child is present in court, "he may choose to testify as to his wishes, and the court <u>shall</u> consider his testimony in the matter." (Emphasis added). This statutory directive could not be more clear.

Again, the primary purpose of CINC proceedings is to determine whether a child's welfare is seriously endangered if left in the custody of the parent against whom allegations have been brought (regardless of parallel custody proceedings in

the district court). Furthermore, this Court cannot properly review the juvenile court's adjudication without an adequate record on appeal. Given that the parties' apparent expectations of producing additional evidence were thwarted when the juvenile court immediately dismissed the State's petition on the father's motion for directed verdict, we reverse the juvenile court's ruling and remand for a new adjudication.[10]

*Proffering inadmissible evidence*

The State's second assignment of error argues that the juvenile court abused its discretion in preventing the State from proffering evidence related to the father's possible motivation for allegedly coaching his daughter to lie about sexual abuse, and in limiting the State's discussion of the evidence to issues addressed in its petition. We agree.

Pursuant to La. C.C.P. art. 1636 A, "[w]hen the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence." The foremost goal in CINC proceedings, protection of a child from abuse or neglect, requires that any evidence adjudged inadmissible be proffered for review. Although the hearing transcript reflects that the juvenile court initially indicated it would permit the State to proffer evidence related to the father's alleged motive—namely, the child support and custody dispute—the court thereafter sustained the father's objection as the State attempted to elicit this additional evidence, in violation of Article 1636's mandate.

---

[10] To the extent appellee's brief to this Court and/or the juvenile court's Reasons for Judgment include facts that were not made part of the record in this case, we note that such facts are not reviewable unless admitted into evidence or proffered. When a bench trial is conducted, as here, there is scant reason to prohibit the introduction of evidence into the record unless that evidence is completely unrelated to the proceedings before the court. *See* La. Ch. C. art. 663; La. C.E. art. 402.

The juvenile court further abused its discretion when it ruled that the State's questioning was limited to the specific allegations listed in the petition. No such limitation is imposed by the Children's Code or CINC jurisprudence. A CINC petition must allege only "facts demonstrating grounds for adjudicating the child in need of care." *State in the Interest of H.C.*, 12-1119 (La. App. 3 Cir. 1/16/13), 106 So.3d 769, 772, *writ denied*, 13-0394 (La. 3/15/13), 109 So.3d 388. The petition here alleges such facts. Nothing prohibits the parties from offering additional evidence relevant to the CINC adjudication and the children's safety. The State's second assignment of error has merit.

*Sequestration of expert witness*

The State's third assignment of error contends the juvenile court erred in refusing to exempt Dr. Ann Troy from the sequestration order. The court's evidentiary ruling is reviewed for an abuse of discretion. *Brandt v. Engle*, 00-3416 (La. 6/29/01), 791 So.2d 614, 620.

La. Ch. C. art. 661 D states:

> On its own motion the court may, and on the request of a party the court shall, order that the witnesses, other than parties, be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interest of justice, the court may exempt any witness from its order.

Similarly, La. C.E. art. 615 provides for witness sequestration but specifically exempts "A person whose presence is shown by a party to be essential to the presentation of his cause such as an expert." The State argues on appeal that there was no need for a special showing that Dr. Troy was essential to the State's presentation, yet the clear wording of the La. C.E. art. 615, which the State argues is applicable here, requires such a showing. The hearing transcript reflects that the State objected to the juvenile court's refusal to exempt Dr. Troy from the sequestration order but does not include a showing why Dr. Troy should not be

sequestered. Without such a showing, we cannot say the juvenile court abused its discretion in refusing to exempt Dr. Troy from the sequestration order.

CONCLUSION

The juvenile court's ruling granting the father's motion for a directed verdict (involuntary dismissal) is reversed and the case is remanded for a new adjudication. The parties may enter into the record all relevant evidence admissible under the Louisiana Children's Code and the Louisiana Code of Evidence. Should the juvenile court determine that potential evidence is inadmissible, the court must state the reason for its inadmissibility, and the parties must be permitted to proffer inadmissible evidence.

**REVERSED AND REMANDED**
**FOR NEW ADJUDICATION HEARING**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN S. BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**JANUARY 7, 2022** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 21-CA-634

**E-NOTIFIED**
JUVENILE COURT (CLERK)
HONORABLE ANN MURRY KELLER (DISTRICT JUDGE)
ELIZABETH B. CURREN (APPELLANT)          LEKITA G. ROBERTSON (APPELLANT)          THOMAS J. BUTLER (APPELLANT)
FATMEH T. ALI (APPELLANT)                 DOUGLAS L. HARVILLE (APPELLEE)           JENNIFER G. WOMBLE (APPELLEE)
ELIZABETH G. LINCOLN (APPELLEE)

**MAILED**
HONORABLE PAUL D. CONNICK, JR.
(APPELLANT)
DISTRICT ATTORNEY
DOUGLAS E. RUSHTON (APPELLANT)
ASSISTANT DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053